DAVID LEE MINNICK, Plaintiff, v. STATE FARM MUTUAL AUTO-MOBILE INSURANCE COMPANY, a foreign corporation, Defendant.

(*October* 9, 1961.)

STOREY, J., sitting.

*Everett F. Warrington* for the Plaintiff.

*Pricket and Prickett* for the Defendant.

Superior Court for Sussex County, No. 179, Civil Action, 1959.

STOREY, J.:

This is a revised opinion filed as the result of a reargument on a motion for summary judgment.

Plaintiff-insured brought this action to recover benefits which he alleges are due to him under the terms of a comprehensive automobile insurance policy. (By "comprehensive", I mean general in scope, including liability, collision, medical and various other types of coverage.) Defendant-insurer has moved for summary judgment upon the premise that the policy was not in force on the day of the accident.

For the purpose of this motion, the following essential facts are undisputed. On May 17, 1955, the plaintiff purchased the policy in question from the defendant. The policy period was declared to be from May 17, 1955 to May 29, 1955, "and for such succeeding periods of six months each thereafter as the required renewal premium is paid by the insured on or before the expiration of the current policy period and accepted by the company." Thus, there were two "due dates" in each calendar year—the 29th of May and the 29th of November.

The assessed premiums were paid by plaintiff and accepted by defendant for the policy periods up to and including May 29, 1959. Throughout this period, the defendant followed the practice of sending plaintiff two distinct reminder notices relative to each due date. The first notice sent was a semi-annual premium notice which was intended to arrive in advance of the pending due date. It set forth the due date and the amount of premium assessed and advised the

plaintiff that "payment by due date continues this policy in force for six months." We will call this the "blue notice". The second notice, called the "red notice", was an expiration notice, which also set forth the due date and amount assessed, but further advised the plaintiff that although his policy had expired "payment within ten days of due date would renew [the] policy and provide continuous coverage". Neither of these notices was required by the policy term, nor did the policy provide for the ten day grace period and continuous coverage as offered by the red notice.

It would appear that for many, if not all, of the due dates from November 1955 through November 1958 the plaintiff mailed his premium check sufficiently late so as to preclude its arrival at the defendant's offices prior to the due date then in question. On several occasions, it was mailed as late as seven or eight days after the due date. However, the defendant always accepted the tender, and it may be assumed that continuous coverage was provided from May 17, 1955, up to and including May 29, 1959.

Sometime prior to November 29, 1958, the plaintiff changed his address within his home town of Seaford. The premium notices for that due date were sent to his old address and later delivered to him in person by the tenant who succeeded him at the old address. In paying the premium for said due date, plaintiff notified the defendant of his new address by properly filling in a form provided for that purpose on the premium notice itself.

Despite this notification of change of address, the blue notice for the premium due 29 May 1959 was still sent to plaintiff's old address and, as a result of this admitted negligence, it was not delivered by the mailman to the new address until the 7th or 8th of June, 1959. Thus, it was delivered nine or ten days after the due date.

On June 10th, plaintiff deposited in a U. S. Mail box in his home town of Seaford, a properly addressed and stamped envelope which contained his premium check in the amount of $31.40, and the abovesaid tardy blue notice. On June 14th, plaintiff wrecked his automobile while on a visit to Pennsylvania. On June 16th, at 6:30 A.M., the afore-mentioned envelope was postmarked out of Seaford. On June 17th, it was received by defendant at its Virginia Offices.

At this point, yet another of defendant's administrative practices comes into the picture, once again a practice not covered by the policy terms. Simply stated, this practice provided for those cases where premium payments were received by mail at defendant's office in the period from ten to forty days after the due date, in which case the policy would be reinstated effective the postmark date on the envelope. From the due date to the date of reinstatement, such a policy would presumably be recorded in the defendant's records as being a lapsed policy. Pursuant to this practice, defendant reinstated plaintiff's policy effective the postmark date of June 16th. Plaintiff's check of June 10th was cashed by defendant and on June 29th, defendant drew a refund check, to the order of plaintiff, in the amount of $3.14, for the eighteen days during which the policy is alleged to have been ineffective. On July 6th, this refund check was sent by registered mail to the plaintiff at his new address, along with a letter, dated also on July 6th, wherein defendant gave notice of its disclaimer of coverage, predicated upon the alleged lapse.

There is nothing in the record to indicate when plaintiff first notified defendant of the accident.

The defendant is a mutual company known as the State Farm Mutual Automobile Insurance Company. Plaintiff became a member of the company when he first took out his policy in May 1955. The policy provides under the heading "Mutual Conditions" that:

"The membership fees set out in this policy, which are in addition to the premiums, are not returnable but entitle the named insured to insure one automobile for the coverages for which said fees were paid so long as this company continues to write such coverages and the insured remains a desirable risk.

"While this policy is in force, the named insured is entitled to vote at all meetings of members and to share in the earnings and savings of the company in accordance with the dividends declared by the Board of Directors on this and like policies."

The record reveals that the precise assessment for nine successive due dates from May 1955 to May 1959 sequentially ranged over the following figures: $38.81; $35.40, $35.40, $35.90, $33.50, $34.70, $34.70, $34.70, $31.40. Such are the facts.

The question is whether the record, as above summarized, shows such a *prima facie* lack of coverage on June 14, 1959, as will justify a summary judgment for defendant. For the following reasons, I hold that it does not, and, therefore, summary judgment must be denied.

To my mind, the primary point of departure in analyzing this case is on examination of the question of notice. Therefore, I begin by asking: Was defendant required to give plaintiff notice of the impending due date of 29 May 1959 and of the amount of premium assessed for the six months' period beginning that date?

My first opinion was in large part predicated upon a concept which I denominated "the notice-mutuality concept". I started with the proposition that defendant was a mutual insurance company and might be described as:

"* * * a cooperative enterprise wherein the members constitute both insurer and insured, where the members all

contribute, by a system of premiums or assessments, to the creation of a fund from which all losses and liabilities are paid, and wherein the profits are divided among themselves in proportion to their interest."[1]

I then noted that the premiums for which plaintiff was assessed throughout his course of dealing with defendant varied for the various six months' periods from a high of $38.81 to a low of $31.40, and I concluded that such fluctuations reflected a process by which defendant calculated its semi-annual requirements and pro-rated the expense among its members.[2] As the company's monetary requirements varied with its increase or decrease in gross liability payments, so, too, would the individual member's assessments vary. Such variations could only be calculated by defendant's statisticians. Plaintiff had no valid device by which he could anticipate the ultimate amount he could be required to pay in any particular six months' period.

Up to this point, defendant's counsel took no issue with my original opinion. However, he made strenuous objections to my subsequent analysis, for it was then that I proceeded to apply a general rule of law which I felt to be applicable, namely:

"Where premiums on insurance policies are variable and their precise amount is determined by conditions wholly within the knowledge of the insurer, the giving of notice is an essential prerequisite to a default for nonpayment of premiums. Thus, forfeiture of a life insurance policy for non-

---

[1] 29 *Am. Jur.* Insurance, § 89.

[2] For the purposes of this motion, it would seem somewhat academic whether the ultimate assessment levied upon plaintiff by defendant was in fact a fixed premium reduced by a declared dividend or increased by an extra assessment or whether it was simply a prorated assessment predicated upon the overall requirements for a six months period. In any case, the ultimate assessment was a variable which could only be determined by the defendant.

payment of premium when it becomes due cannot be insisted upon when the insured is entitled to share in the profits, and therefore cannot know what amount he is required to pay, and no notice has been given him of what sum the insurer claims to be due from him. Similarly, where the insured under the contract is entitled to a deduction of dividends from the amount of the premium, it is the duty of the insurance company to give the insured seasonable notice of the amount of his dividends before a forfeiture of the policy can be declared."[3]

In quoting this general principle, I noted that most, if not all, of the citations in the text and annotations involved mutual *life* insurance policies, but I further observed that I was unable to see how that factor alone would tend to affect the efficacy of applying the general premise set forth in those cases[4] to the particular issue now at bar. Therefore, I applied the premise and held that the defendant was required to notify plaintiff of the amount due before it would declare a forfeiture or default for non-payment.

Defendant argues that the last quoted principle should not be applied to it for several reasons. First of all, defendant seizes upon the observation that the cases cited in the texts and annotations as being in support of said principle almost invariably deal with life insurance policies. This, defendant considers to be significant, for it urges that there is a crucial distinction between non-term life insurance policies and those term policies dealing exclusively with indemnity or liability insurance. To illustrate this distinction, it refers to certain language in the case of *Penn Mutual Life Insurance Company v. Lederer* (1920) 252 *U. S.* 523, 40 *S. Ct.* 397, 64 *L. Ed.* 698.

---

[3]29 *Am. Jur.* Insurance, § 524. See also 140 *A. L. R.* 683, Subsection II b of annotation; and 5 *Couch on Insurance* 2d, § 30:136, p. 669.

[4]For an example of such cases see *Phoenix Mut. Life Ins. Co. v. Doster,* (1882) 106 *U. S.* 30, 1 *S. Ct.* 18, 27 *L. Ed.* 65.

It might be well to attempt to paraphrase defendant's argument. It characterizes comprehensive automobile policies, such as we are herewith concerned, as being designed to provide protection for a specified period of time against possible though uncertain future losses, which may or may not occur within any particular policy period. These policies are almost purely protective in their nature and the premiums for them are "supposed to be sufficient, and only sufficient, to pay the losses which will fall during the current year" or policy period.

In contradistinction, however, life insurance policies are viewed not only as protective in their nature, but what is to the defendant more important, they are also viewed as being primarily in the nature of a savings investment plan. The insured pays his premiums by way of an investment. His policy may well have a loan value predicated on a graduated scale. When the policy is fully paid he may be able to receive an annuity, or he may choose to keep the investment in the policy for payment to his estate or his beneficiaries upon his death. All of this is clearly analogous to a savings plan. Whereas the protective device in such a policy is most apparent in those instances where death occurs before the policy is fully paid up, in which case insurer will pay off on the face value of the policy, notwithstanding the fact that it may have received only a very small amount in premium payments.

From this base, defendant goes on to argue that when an insurer declares a forfeiture on a non-term life insurance policy it does more than merely stop the coverage and void the contract; it actually presumes to deprive the insured of all he had theretofore paid in; his "savings", if you would, have been confiscated for failure to pay due premiums. This, defendant admits to be a very acute loss, and argues that because it is so harsh the Courts apply the above styled "notice-mutuality concept". But defendant goes on to contend that the "notice-mutuality concept" need not be, indeed, should not be, employed in the case of such strictly protective and term type

automobile policies as we have at bar. For in such policies, the coverage is purely protective, limited to a specified term, and at the end of the term the insured will have received all that he paid for, *i.e.*, protection for the specified period. If he should fail to pay the premium at the end of the policy period, the policy would simply expire by its own terms. It would not be "forfeited" by the company. The insured would have no complaint if he had no more coverage, for he had not paid for new coverage and had gotten all that he had paid for by past premiums.

I must admit that there is a certain lure to this argument which effects a degree of persuasion. In effect, it attempts to prove a negative by negative reasoning, and its premises have been somewhat oversimplified. Furthermore, the argument is solely the product of defendant's particular logic, reflecting an attempt to deduce a reason behind a pattern. All the cases supporting the "notice-mutuality concept" seem to be life insurance cases, which fact defendant couples with an analysis of the harsh loss effected in a life insurance forfeiture and then produces the conclusion that the said concept should not be applied to term insurance, since the declaration of a lapse or forfeiture in such a policy does not work the same hardship on insured as would be worked in a non-term life policy.

Defendant's chain of logic is not complete, and, significantly enough, its argument for non-application suffers from the same "defect", as it seeks to visit upon the rationale for application, *i.e.*, no cases. Where I have found nothing but life insurance cases to support application, defendant seems to have found no cases specifically saying the concept is exclusive to life insurance cases and should be applied nowhere else. Furthermore, the cases in support of application, though life cases, do not seem to base their rationale for application of the concept upon the type of policy involved, but rather upon the inability of insured to *know* what his premium will be on such mutual policies. It is the mutuality of the company and

the variability of the assessment of premiums which appears to be the significant and controlling factor.

By the way of further amplification of the weakness of defendant's position, I take note of some of the collateral arguments offered as support for its "prime contention". Thus, it is argued that the policy at bar was not "forfeited" but rather that it simply "lapsed" of its own terms. In the case of *Seavey v. Erickson* (1955) 244 *Minn.* 232, 69 *N. W.* 2d 889, 52 *A. L. R.* 2d 1144, the Supreme Court of Minnesota was faced with an identical semantic argument in an action upon a similar automobile insurance policy. In a footnote on page 895 of 69 *N. W.* 2d, the Court disposed of such distinctions in the following words:

"The insurer claims that we are dealing with an automatic cancellation of the policy and not a forfeiture. The terms are used somewhat interchangeably in the cases, and it is immaterial here whether we refer to the termination of the policy as a forfeiture or cancellation."

I concur, for to try to bolster an argument with such fine distinction would appear to be overly technical, yet such distinctions are the buttresses upon which defendant relies for support. To be sure, such policies as at bar may indeed lapse because of non-payment of premiums when due; but when, as here, the insurer attempts to declare the policy lapsed for non-payment, it is also, to a certain extent, declaring a forfeiture. To illustrate the nature of such a "forfeiture", we have only to look to another of defendant's buttressing arguments.

It is contended by defendant that there was no vested right to renew the policy, but, to the contrary, that the policy terms provide that a premium must be "accepted" by the insurer before there can be a renewal. However, I find that this is not strictly true in the case at bar, and, what is most important, defendant admits a waiver thereof.

 As we have already seen in the statement of facts above, the policy terms under "Mutual Conditions" provide that plaintiff's membership fee entitled him:

"* * * to insure one automobile for the coverages for which said fees were paid so long as this company continues to write such coverages and the insured remains a desirable risk."

There is no question about the fact that the company still writes said coverages, nor has any question arisen relative to plaintiff being a desirable risk.[5] Thus, I believe it proper to say that this clause in the policy tends to support the contention that plaintiff had a certain "right" to continue to insure with defendant. However, there would seem to be some conflict between this clause and the "acceptance" clause, which is set forth in the opening paragraph of the policy, and wherein it is stated that:

"The policy period shall be as shown * * * under 'Policy Period' and for such succeeding periods of six months each thereafter as the required renewal premium is paid by the insured on or before the expiration of the current policy period *and accepted by the company*." (Emphasis added.)
But, though this might seem to give rise to a *prima facie* conflict, I believe it has been resolved in favor of the plaintiff-insured by virtue of certain admitted practices of the defendant-insurer, to-wit:

Defendant's "acceptance" practice was in fact a very automatic and indeed retroactive procedure. It credited the payment as "accepted" on the date of postmark though not actually received in defendant's office until the day after. I believe the Court can take judicial notice of the fact that the

---

[5] If the defendant were to cancel plaintiff's policy because he was no longer a desirable risk, it would employ the provisions in paragraph 19 of the "Conditions" section of the contract, relative to cancellation.

day of postmark almost invariably reflects the date of mailing, or a few hours thereafter. In effect, therefore, by using the postmark date as the date for automatic retroactive "acceptance", the defendant "accepts" as of the date of mailing. The postmark is merely *prima facie* evidence of said date. To this point, defendant observes in its brief that:

"The insurer has been willing to reinstate the policy to be effective on the date the premium payment was postmarked although under the terms of the policy it could insist that the policy was not reinstated until the premium was actually received and 'accepted'. It should not be required to go further and accept the insured's claims about the time the letter was dropped in the mailbox. The Court should find that the company is reasonable and fair in taking the position that it is willing to agree to give coverage where it can fix a reliable date as the time when the insured made an effort to pay the premium. But although it is willing to waive its right to insist on "acceptance" of the premium to that extent, it should not be required to go further and have imposed on it reinstatement of a policy at a time when the insured claims to have dropped the letter in the mailbox. To establish such a rule is to invite fraud."

As I read this defense statement, I find conclusive support for my previously enunciated contention. Defendant admits that the strict construction of the "acceptance" provision has been waived, and that acceptance as such is an automatic thing effective at "the time when the insured made an effort to pay the premium." This time is ascertained by the postmark, and as I have observed, it will almost invariably be a correct ascertainment. I do not understand the defendant to argue that there is anything magical about a postmark date, it is merely an indication of a date of mailing. But it is an indication only, and it may be in conflict with the actual

date of mailing.[6] In this case, there appears to be such a conflict, and so defendant finds itself impaled upon the horns of a dilemma. This is a motion for summary judgment—defendant's motion—and, for the purposes of this motion, defendant is bound by the facts as stated. Thus, for this motion, we accept as fact the statement that the letter was actually mailed on June 10th, and we explain the discrepancy between that date and the postmark date as evidence of inefficiency on the part of the postal authorities. Defendant is straddled with this fact, and it goes a long way towards defeating its motion. Therefore, when defendant relied on the postmark date as reflecting the date of mailing, it was misled, and must, for the purpose of this motion, admit that mailing occurred on June 10.[7]

Thus, the chain of defect in this last argument might be summarized as follows: Defendant says there is no vested right to renew, yet the policy provides for renewal "as long as" the company writes such policies and plaintiff remains a desirable risk. To support the no-right-to-renew argument, defendant refers to the acceptance-by-the-company clause, yet it defeats whatever efficacy said clause might otherwise possess by admitting that it had waived the strictures of said clause and had adopted the practice of effecting reinstatement the date of postmark, on the basis that said date tended to "fix a reliable date as the time when the insured *made an effort to pay* the premium." Unfortunately for defendant, however, it is now faced with the admitted fact that plaintiff

---

[6]Indeed, some contracts specify that the postmark date shall be the controlling date to overcome just such conflicts as have here arisen.

[7]This, of course, is no finding of fact, it is merely the recognition of an admission of fact for the purpose of this motion only. I am not concerned with what will develop at trial. In taking this position I do not establish a rule which "will invite fraud". I establish no rule. I merely require defendant to abide by the facts as admitted for the purposes of its motion. At trial, nothing will be imposed on defendant that is not proved by the evidence.

"made an effort to pay" by mailing his premium on the 10th of June. This places defendant in the untenable position of urging the Court to look to the formality of the postmark, mere *prima facie* evidence of mailing, and disregard the substantive fact, as admitted, that mailing actually occurred six days prior. Needless to say, the Court does not see fit to follow such a lead.

Before a regularly renewable mutual insurance policy may be declared forfeited, lapsed, cancelled or in default for non-payment of premiums due, the insurer must have given notice to the insured of the amount of premium assessed for the particular policy period then in question.

But, though I tend to favor the above concept, there is yet another rationale, perhaps equally meritorious, that produces the same requirement of notice under the facts at bar. That is the waiver-estoppel concept, some elements of which have already been touched upon. This was the original basis of analysis utilized by these litigants.

The applicable rule under such an analysis might be summarized as follows:

"By the weight of authority and by what is the more equitable view, the necessity for giving notice of the amount and date on which a premium is due may be based upon the practice or usage of the particular insurer. Accordingly, when an insurer uniformly follows the practice of giving notice of payments for such a length of time as leads those insured to believe notice will be given, it cannot declare a forfeiture without giving notice, or without previously advising the persons who have relied upon receiving notice that the custom will or has been discontinued * * *."[8]

---

[8]5 *Couch on Insurance* 2d, § 30:128, p. 661.

While this rule has not received universal acceptance,[9] it seems to me to be the most judicious one. It was applied in the already cited case of *Seavey v. Erickson* (1955) 244 *Minn.* 232, 69 *N. W.* 2d 889, 52 *A. L. R.* 2d 1144. Justice Knutson's opinion in that case is a well reasoned and forceful analysis of the law of waiver and estoppel as it applies in just such a case as we have at bar. I concur in all respects. After applying the rule, the Court observed that:

"Any other rule simply would create a trap which could be used as a convenient device to work a forfeiture when it was to the interest of the insurer to invoke the express provisions of the policy and permit it to waive such provisions and collect the premium when it was to its interest to do so. * * * The insurer, having established the custom of giving notice, is now estopped to declare a forfeiture in the absence of such notice." *Seavey v. Erickson, supra* at 897 of 69 *N. W.* 2d.

It cannot be gainsaid that this rule could be applied to the case at bar, and I so apply it. Defendant, though not contractually obligated to do so, adopted the practice of sending out the above mentioned "blue" and "red" notices. Insured had received the benefit of this service for the life of his policy, a period of several years. This is an adequate time to establish a custom and usage in the dealings between the parties. Defendant had a right to relax and rely upon the anticipated notice advising him of the impending due date. (Indeed, as noted above, he *had* to rely on the notice to advise him of the *amount* due, but this is somewhat off our present point.) Thus, for this reason, I once again reach the same conclusion and hold that defendant could not declare plaintiff's policy lapsed, cancelled, forfeited or in default for non-

---

[9] 29 *Am. Jur.*, Insurance, § 525, p. 833.

payment of premiums until it had given plaintiff seasonable notice of the time for payment and the amount due.[10]

■ We now come to the question of whether the defendant rendered effective and seasonable notice so as to justify a forfeiture for non-payment. It is conceded that the blue notice was mailed to plaintiff, but it was sent to his old address, despite the fact that he had duly notified the defendant of his new address. Because of this negligence of defendant, plaintiff did not actually receive the notice from the postman until June the 7th or 8th, already nine or ten days beyond the due date. Two or three days thereafter, plaintiff mailed his premium to defendant in a properly addressed and stamped envelope. The general law in this area has been summarized as follows:

"Where a notice is mailed * * * there is a presumption that it was received, provided, of course, it was properly addressed and stamped. * * * [But] a notice of maturity of a premium which is improperly addressed and does not reach the assured cannot establish a forfeiture."[11]

[Thus], "if the insured changes his address and gives proper notice of such change to the insurance company * * *, but the insurer despite such notice mails a premium or assessment notice to the insured's original address, such notice does not effectively bind the insured as to the consequences thereof."[12]

---

[10]It would seem that requirement of notice before default is not an absolute thing, whether founded on the notice-mutuality concept or the waiver and estoppel rule. Certainly, there must come a point when payment is so overdue that the insured must take action to protect himself. Because the time element in this case is of such a small magnitude I am not required to consider this problem, but I do not mean to imply that because of insurer's error an insured can get free coverage indefinitely.

[11]29 *Am. Jur.,* Insurance, § 528, p. 836; see also 20 *Am. Jur.* Evidence, §§ 196-198.

[12]*Am. Jur.,* Insurance, § 529, p. 837.

Applying these general principles to the particular facts of this case, I conclude that though mailing was an approved form of giving notice, which we could normally presume would be received in the due course of the mails, we cannot engage in such a presumption or consider mailing itself an adequate notice[13] where there is a misaddressing despite due notification of the new address. Plaintiff could not be charged with the requisite notice until he actually came into possession of the notification document,[14] which did not occur until June 7th or 8th.

■ Up until the time plaintiff received actual notice of his premium assessment, the policy in question could not have lapsed for non-payment, that is to say, the old policy term remained in force. The actual notice was received by the tenth day after the normal due date, so we are not concerned with an excessive delay in payment or an excessive extension of coverage. The notice was an invitation to pay; tardily received, but an invitation nonetheless. Two or three days later, plaintiff acted to effect payment. Did he wait too long? I do not think so, but this is a question for the trier of fact. I do not believe I can declare a two or three day delay excessive as a matter of law. Plaintiff was entitled to "seasonable" notice of the amount due. In the case of *Phoenix Mut. Life Ins. Co. v. Doster* (1882) 106 *U. S.* 30, 1 *S. Ct.* 18, 27 *L. Ed.* 65, the due date was 20 September, the misaddressed notice was mailed on 4 October and came into the hands of insured's son, a beneficiary, on 6 October, a few hours before the insured's death. The son made tender on 9 October. It was found at trial that this was not an unreasonable delay, and the Supreme Court affirmed. Thus, I feel safe in assuming, *arguendo*, that plaintiff did not delay unreasonably in waiting

[13]I do not treat of the question of whether mailing is itself an adequate notice where properly addressed and stamped, though the policy terms providing for notice of cancellation would seem to indicate such was the intent.

[14]5 *Couch on Insurance,* § 30:156, p. 689.

until the 10th of June before he mailed his premium to defendant.

On June 10th, plaintiff deposited in a regularly used U. S. mailbox a properly stamped envelope correctly addressed to defendant's Virginia office, which contained his check for the full premium and the above noted tardy blue notice. The envelope was not postmarked out of Seaford until June 16th at 6:30 A.M. It was finally received by defendant on June 17th. There is no question but that the mails were an authorized media of notice and payment, especially since the notice to pay was sent by mail and the defendant provided a pre-addressed business envelope in which to make remittance. The question posed by these last facts is when did plaintiff become covered by the new policy period, or have a right to assume that he was so covered?

Assuming that there was no excessive delay on plaintiff's part in waiting the two or three days to mail the premium once he had actually received the blue notice, then I believe coverage on the new term commenced on 30 May. This is so because there could be no lapse or forfeiture for non-payment until notice was given. Once given, the plaintiff had a reasonable time in which to make remittance. Once made, it was in the full amount and intended to cover the full period, and once made it was only proper that it should be in the full amount, for otherwise plaintiff would have been given several days of coverage for free and this is not required. Though defendant could not suspend coverage due to its own failure to give proper notification, it was, nonetheless, entitled to full compensation for the coverage given, should plaintiff choose to renew, as he did. In effect, plaintiff received several days of coverage on credit until the notice issue was clarified, and it was clarified when he exercised his right to renew by mailing his premium within a reasonable time. By removing the previous uncertainty resulting from defendant's failure to give notice, this clarification had the effect of putting the parties

in the status they would have been in had notice and renewal taken place within their proper and expected calendar dates. This being so, defendant's attempt to refund $3.14 was improper and plaintiff was correct in not cashing the refund check for he was not entitled to it. This, of course, is an objective analysis spawned by a full knowledge of the facts, a knowledge which neither plaintiff nor defendant possessed until this issue was joined.

When plaintiff mailed his check on June 10th, he had no reason to assume it would take seven days to reach its destination. To the contrary, he could presume delivery in the due course of the mails. Disregarding the herein revealed delay by the Seaford Postoffice, one could assume that a letter posted in lower Delaware on a Wednesday evening at about eleven o'clock would reach Charlottesville, Virginia, sometime Friday, these being the relative days involved. Thus, defendant's records would have been straightened out before the date of the accident on Sunday, the 14th. What is more, had everything gone normally at the Postoffice, the letter should have borne an early postmark for Thursday, the 11th, in which case, defendant, by its admitted practice, would have "reinstated" the coverage effective said postmark date, and this issue would not have come to light unless defendant would have tried to make a refund or would have tried to back down its own administrative practice.

In effect, therefore the blame for much of the confusion in this case can be laid at the door of the postal authorities. Between our litigants, who should bear the imputed responsibility for the postal neglect? Clearly, the defendant. Once the insurer requests, authorizes, or acquiesces in the case of the mails for remittance, as here, then there is virtually no question but that it adopts the postal authorities as its agents and assumes the responsibility for their failure to make timely delivery of a properly addressed and stamped en-

velope which was mailed within the proper time limits.[15] The only question would seem to be whether a premium payment so mailed was "delivered" to insurer as soon as it was deposited with the postal authorities, or whether it would be presumptively "delivered" in the normal due course of the mails. Defendant's administrative practice of effecting reinstatement as of the postmark date seems to be in line with the deposit concept, and, as above noted, the postmark date would normally be the same as the deposit or mailing date. The "deposit" theory of delivery was adopted in the case of *Primeau v. National Life Ass'n (Supreme* 1894), 77 *Hun* 418, 28 *N. Y. S.* 794, at 797, wherein the Court said:

"It is * * * very clear that the defendant authorized, and in substance requested, the plaintiff to make the payment in question, as well as previous payments, by mail. It sent each time to the plaintiff an envelope, directed to the company, and requested him to use it in sending his remittance; and the payments had previously been so made. We have, then, in effect, a case where, by the authority of the creditor, (sic.) a payment is sent by mail. In such a case, after deposit in the post office, it is at the risk of the creditor, and the payment is deemed to have been made at the time of the deposit."

Thus, without presuming to resolve the various merits of the "deposit" theory of delivery as opposed to the "due-course-of-the-mails" concept, I believe it quite clear that defendant assumed the burden of postal negligence, and I am prepared to hold that defendant's administrative practice on reinstatement effective the postmark date has the effect of waiving any right defendant might have had to claim under the "due-course-of-the-mails" concept. Payment was made on the 10th of June.

---

[15]See 29 *Am. Jur.* Insurance, § 586 and Annotation 1 *A. L. R.* 677.

And now, because the foregoing analysis has been rather lengthy, I believe a summary to be in order.

Defendant is a mutual insurance company and as such its premiums are variable. Plaintiff could have no knowledge of the amount of his premium for any particular period until he had been so advised by defendant. Because of this, defendant is required to give plaintiff seasonable notice of the amount of premium due before it can declare a forfeiture for non-payment. This is the notice-mutuality concept. Alternatively, defendant had adopted the practice of giving notice of the amount and date of premiums due; this was a practice of several years duration. In adopting this practice defendant gave rise to a course of usage which precluded it from declaring a forfeiture for non-payment of premiums unless said notice was given. This is the waiver-estoppel concept. Either way, defendant was required to give seasonable notice of the premium date before it could declare a forfeiture for non-payment.

When such a notice is mailed, there is no presumption of delivery unless it is properly addressed. The notice for the due date of 29 May was sent to plaintiff's old address, despite the fact that defendant had been duly advised of plaintiff's change of address. Thus, the notice was improperly addressed due to defendant's negligence and no presumption of delivery can be applied.

There was an actual, though tardy, delivery of the notice on 7 or 8 June, 9 or 10 days after the due date. Whereupon, plaintiff responded in a reasonable fashion and mailed his full premium payment to defendant in a properly stamped and addressed envelope. Because of defendant's administrative practice of crediting reinstatements effective the postmark date, i.e., date of mailing, the plaintiff may be considered to have paid on the 10th of June, when he deposited his premium in the mail, the mail being defendant's agent by virtue of defendant's request and authorization that the mail

be used for remittances. Defendant's said administrative practice also has the effect of waiving any argument for the application of the strictness of the "accepted-by-the-company" clause in the policy.

Up until June the 7th or 8th, the old policy term continued in force for it could not be declared as lapsed due to the defendant's failure to give seasonable notice. When payment for renewal was made on the 10th, it had the effect of clarifying an otherwise confused situation which had resulted from defendant's negligence in not giving notice. The end result was that the coverage was renewed as of the 30th of May just as though notice and renewal had occurred within the normally expected dates, because the renewal had occurred within the normally expected dates. Because the renewal was in this respect retroactive, plaintiff was liable for the full premium, and the coverage defendant had been forced to extend from 30 May through 10 June was merely extended on credit awaiting the abovesaid clarification by retroactive renewal.

For these reasons, there was coverage on the date of the accident, June 14th, and, therefore, defendant's motion for summary judgment must be and herewith is denied.

On presentation, order, in conformity with this decision, will be entered.