**DELAWARE INSURANCE GUARANTY ASSOCIATION, Plaintiff Below Appellant,**

v.

**CHRISTIANA CARE HEALTH SERVICES, INC., a Delaware corporation, successor in interest to Riverside Healthcare Corporation and Osteopathic Hospital Association of Delaware, Inc., Defendant Below Appellee.**

No. 244,2005.

Supreme Court of Delaware.

Submitted: Nov. 10, 2005.

Decided: Jan. 24, 2006.

---

**12.** *Collins v. Burke,* 418 A.2d 999, 1002–03 (Del.1980).

**13.** *Libeau v. Fox,* 880 A.2d at 1052–53.

Michael L. Sensor, Perry & Sensor, Wilmington, Delaware for appellant.

Daniel P. Bennett (argued) and Miranda D. Clifton, Heckler & Frabizzio, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, BERGER and RIDGELY, Justices.

STEELE, Chief Justice.

In this civil action, Appellant, the Delaware Insurance Guaranty Association, sought reimbursement from Appellee, Christiana Care Health Services, under one of the Delaware Insurance Guaranty Association Act's net-worth provisions [1] for claims paid on behalf of an insolvent insurer which insured a corporation that merged with CCHS. A Superior Court judge granted CCHS summary judgment holding that CCHS was not an "insured" under the policy in question and was, therefore, also not an "insured" under 18 *Del. C.* § 4211(2)(a). Because we find that the determination of an "insured" for purposes of § 4211 must be interpreted within the parameters of the purpose and intent of the statute, and not by the terms of the insurance policy inconsistent with that purpose and intent, we reverse. We hold the CCHS became an "insured" for purposes of § 4211 by operation of law after Riverside merged into CCHS. CCHS, therefore, is obligated to reimburse DIGA for amounts DIGA paid out on behalf of CCHS.

## I.

On December 29, 1995, Riverside Health Care Corp. and its subsidiary, Osteopathic Hospital Assoc. (a.k.a. Riverside Hospital) of Delaware merged with and into The Medical Center of Delaware, Inc., which later changed its name to Christiana Care Health Services. Four years before this merger, Kathleen Euston, then an employee of the Osteopathic Hospital Assoc. of Delaware, suffered a work related injury. At that time, Riverside had a workers' compensation insurance policy issued by PHICO Insurance Company. Euston brought a claim that PHICO accepted and PHICO began paying benefits on her behalf. After the merger, Euston petitioned the IAB for payment of additional benefits, which PHICO also paid.

On or about February 1, 2002, the Commonwealth Court of Pennsylvania declared PHICO insolvent. As required by statute, DIGA assumed PHICO's rights and obligations under the Delaware Insurance Guaranty Association Act.[2] On April 5, 2002, after PHICO's insolvency, Euston petitioned the IAB for additional permanency benefits. In accordance with its statutory obligations, DIGA defended CCHS in the action and ultimately paid $37,977.50 to settle Euston's outstanding claims. On July 30, 2003, DIGA filed a complaint against CCHS in the Superior Court to recover that amount.

On May 19, 2005, in an oral ruling on cross-motions for summary judgment, the Superior Court judge ruled in favor of CCHS, noting, "Well, I'm going to construe the statute and the plain language of the statute to limit it to the insured. And the insured here is indisputably Riverside, and that does not include Christiana [CCHS]." [3] The Superior Court issued an

---

1. *See* 18 *Del. C.* § 4211(2)(a). Section 4211 is one of two net-worth provisions provided for in the Delaware Insurance Guaranty Association Act. Section 4211 provides authority for DIGA to be reimbursed for claims paid on behalf of an insured with a net-worth of 25 million dollars or more as of December 31 of the year before the year the insurer is declared insolvent. Moreover, § 4205 excludes from the definition of "covered claims" any first party claims by an insured with a net-worth of 10 million dollars or more as of

December 31 of the year before the year the insurer is declared insolvent.

2. 18 *Del. C.* ch. 42.

3. The Superior Court judge in this case apparently believed that she would have to read language into the statute that was not there in order to hold for DIGA. More specifically, she would have to add "or its successor" to 18 Del C. § 4211(a)(2) so that it would read permit DIGA to recover amounts it paid on

Order on May 25, 2005 granting CCHS motion for summary judgment and denying DIGA's motion for summary judgment. DIGA appeals from this Order.

DIGA's argument on appeal is straightforward. DIGA argues that 18 Del.C. Ch. 42, specifically the net-worth provision contained in § 4211(a)(2), authorizes it to recover from CCHS any claims it had to pay on behalf of "[a]ny insured whose net worth on December 31 of the year immediately preceding the date the insurer becomes an insolvent insurer exceeds $25,000,000 and whose liability obligations to other persons are satisfied in whole or in part by payments made under this chapter."[4] DIGA further argues that CCHS's merger with Riverside resulted in CCHS becoming an "insured" for purposes of § 4211(a)(2). Finally, DIGA notes that CCHS stipulated that it had a net worth of more than $25 million as of December 31 of the year before PHICO's insolvency. Therefore, DIGA concludes that the statute requires CCHS to reimburse DIGA for the $37,977.50 DIGA paid Euston.

CCHS responds with an equally succinct argument, pointing out that "Item 1 of the Information Page" of PHICO's policy defined an "insured" and that Riverside was the only named insured under that policy term. CCHS further argues that the inclusion of "subsidiaries" in § 4205, coupled with the omission of "affiliates" or any other expansive phrase in § 4211 suggests that the term "insured," as used in § 4211, is synonymous with "named insured."

Riverside, not CCHS, is the named insured under the policy, and therefore, CCHS argues, it is not required to reimburse DIGA for the money DIGA paid Euston on its behalf.

## II.

### A. Standard of Review

 In deciding questions of statutory construction we must determine "whether the Superior Court erred as a matter of law in formulating or applying legal principles."[5] Therefore, our review of the Superior Court judge's interpretation is *de novo.*

### B. Consequence of Merger with the "named insured"

 An established principle of Delaware insurance law is that an "insured" is determined by the terms of the insurance policy.[6] This doctrine is of little help, however, when determining who the General Assembly intended to include as an "insured" when drafting the Delaware Insurance Guaranty Association Act.[7] The only guidance provided is that the statute "shall be liberally construed to effect the purpose ... of th[e] title ...."[8] And, that the purpose of the title is to "provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment [and] ... financial loss to claimants ... because of the

---

behalf of: "[a]ny insured *or its successor* whose net worth on December 31 of the year immediately preceding the date the insurer becomes an insolvent insurer exceeds $25,000,000...."

4. 18 *Del. C.* § 4211.

5. *Moses v. Board of Educ. of New Castle County Vocational Technical School District,* 602 A.2d 61, 63 (Del.1991).

6. *Hallowell v. State Farm Mut. Auto. Ins.,* 443 A.2d 925, 926 (Del.1982); 3 Couch on Ins. § 40:1.

7. 18 *Del. C.* ch. 42.

8. 18 *Del. C.* § 4204.

insolvency of an insurer ...." [9] With the General Assembly's stated purpose in mind, we must determine whether our legislature intended that the term "insured" include a successor in interest to the original insured by way of merger when the successor retains an insurable interest in an insurance policy, or whether the legislature intended the parties to an insurance policy to define "insured" in the policy in a way that would limit the scope of the impact of the enunciated statutory public policy.[10]

1. **Lack of more expansive language does not clearly exclude a successor in interest by way of merger from the term "any insured."**

█ CCHS argues that because the statute does not use any expansive terms, such as "affiliate" or "subsidiary," to modify "any insured's" natural meaning, the omission prohibits us from engrafting "upon a statute language which has been clearly excluded therefrom." [11] We have stated that when a statute is "unambiguous and there is no reasonable doubt as to the meaning of the words used, [our] role is limited to an application of the literal meaning of those words." [12] In this case however, the General Assembly did not clearly express an intent to exclude a successor in interest from the meaning of "any insured." Therefore, we cannot conclude that 18 *Del. C.* ch. 42 is either "un-

ambiguous" or that "there is no reasonable doubt as to the meaning of [its] words."

█ In any event, we find CCHS's argument unpersuasive because the terms "affiliate" and "subsidiary" carry their own legal significance, neither of which touches on the meaning of a successor in interest. Affiliate refers to a "corporation that is related to another corporation by shareholdings or other means of control," [13] and subsidiary refers to a "corporation in which a parent corporation has a controlling share." [14] By contrast, a successor in interest follows in ownership or control of property retaining "the same rights as the original owner, with no change in substance." [15] Moreover, when the General Assembly has intended to limit the scope of a statutory provision to a named insured in a policy, other legislation establishes that the legislature clearly knows how to do so.[16] Therefore, where, as here, the General Assembly expressly orders that we interpret a statute liberally, CCH's proposed constrained reading cannot be persuasive.

2. **CCHS, as the surviving entity, is the "insured" for purposes of § 4211.**

█ It is a fundamental principle of corporation law that although a merged corporation ceases to exist, in the absence of a specific provision to the contrary, all

---

9. 18 *Del. C.* § 4202.

10. *See In re Adoption of Swanson*, 623 A.2d 1095, 1097 (Del.Supr.1993) (stating "where, as here, the Court is faced with a novel question of statutory construction, it must seek to ascertain and give effect to the intention of the General Assembly as expressed by the statute itself.").

11. *Id.*

12. *Id.*

13. BLACK'S LAW DICTIONARY 59 (7th ed.1999).

14. *Id.* at 345.

15. *Id.* at 1446.

16. *See* 18 *Del. C.* §§ 531 (general requirements for authorized insurers), 906 (kinds of insurance), 3902–06, 3909–12 (casualty insurance contracts), 4121–24, 4126 (property insurance contracts); 19 *Del. C.* § 2387 (workers compensation); 21 *Del. C.* §§ 2902–03, 2118 (motor vehicles and their registration).

property, rights, and privileges of the corporation continue as the property of the surviving entity.[17] In other words, a merger does not allow a predecessor corporation to avoid its pre-merger obligations.[18] Rather, the "liabilities and duties of the respective constituent corporations shall thenceforth attach to ... [the] surviving... corporation, and may be enforced against it ... as if ... [the] debts, liabilities and duties had been incurred or contracted by it." [19] Accordingly, when no merger agreement, or any characteristic of the structure of a merger contemplates avoidance of responsibility under the Insurance Code,[20] the surviving entity retains whatever rights, obligations, or interest its predecessor had as the "insured" under § 4211.[21] Liberally construing the statute to give effect to the legislative intent, we hold, that on these facts, CCHS became an "insured," for purposes of the DIGA statute, under the PHICO policy at the time of the merger when

Riverside merged into CCHS and ceased to exist going forward. Therefore, CCHS is obligated to reimburse DIGA for the amounts DIGA paid to Euston on behalf of CCHS.

### 3. The purpose and policy of the Delaware Insurance Guaranty Association Act support the finding that CCHS became an insured under § 4211 after the merger by operation of law.

The motivation behind the National Association of Insurance Commissioners Insurance Guaranty Association Model Bill, which the Delaware Insurance Guaranty Association Act follows, was a "national concern over the harms to the public resulting from insurance companies becoming insolvent." [22] As stated above, the public harm is the "excessive delay in payment [and] ... financial loss to claim-

---

**17.** When any merger or consolidation shall have become effective under this chapter ... all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations ... but all rights of creditors and all liens upon any property of any of said constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it. 8 *Del. C.* § 251(a).

**18.** *Fitzsimmons v. Western Airlines, Inc.,* 290 A.2d 682, 685 (Del.Ch.1972).

**19.** 8 Del. C. § 259(a).

**20.** It goes without saying that a sham transaction designed simply to avoid § 4211 will not stand. An underlying principle of Delaware corporation law is that "inequitable action does not become permissible simply because

it is legally possible." *Schnell v. Chris-Craft Industries, Inc.,* 285 A.2d 437, 439 (Del.1971).

**21.** *See* 3 Couch on Ins. § 40:1 (stating "The term [insured] can apply to anyone who is insured under the policy, or the owner of the policy"). Admittedly, the analysis in this case is complicated by the fact that the obligation here is contingent on the insolvency of an insurer—a non-existent fact at the time of this merger transaction. This is so because CCHS's net-worth would not be determined until PHICO's insolvency. If, however, we are to give effect to the intended purpose of the Act, regardless of the contingent nature of the obligation the successor corporation may incur under § 4211, the successor corporation does become an insured for purposes of the statute by operation of law upon a merger or acquisition transaction with the predecessor corporation unless otherwise provided for legally and equitably.

**22.** *Witkowski v. Brown,* 576 A.2d 669, 670–71 (Del.Super.1989) (citing 1 Proceedings of the National Assoc. of Insurance Commissioners 52 (1963)).

ants."[23] The Act eliminates this harm by creating DIGA,[24] and directing DIGA to assume the obligations of an insolvent insurer within 30 days of the insurer's declared insolvency.[25]

The Delaware statute spreads the risk-of-loss and financial burden of protecting the public among "member insurers,"[26] by levying an assessment on the business they transact.[27] The net-worth provisions included in the Act are intended to require those who are capable of absorbing the loss that occurs when an insurer becomes insolvent to bear that loss rather than allowing those capable of absorbing the loss to pass it on to the pool of funds created by the levied assessments. Thus the General Assembly apparently concluded, joining a national majority view, that the net-worth provision results in leaving more resources available for those entities less able to absorb an uncovered loss.[28]

The type of delay that the policy of the Act aims to avoid becomes evident by considering how a recipient of workers compensation benefits would collect on his benefits after the insolvency of his employer's insurer if the Act did not exist. First, workers' compensation benefits are considered wages.[29] Accordingly, under the Wage Payment and Collection Act, employers are liable for unpaid workers' compensation benefits terminated or suspended without the authorization or approval of the Industrial Accident Board.[30] In the case where wages are wrongfully withheld, the employer could assume additional liability.[31] In any event, the employer will incur "the costs of the action, the necessary costs of prosecution and reasonable attorney's fees...."[32] Finally, the definition of "employer" provided in the Wage Payment and Collection Act includes a "corporation ... or successor of any of the same employing any person."[33]

In sum, a worker whose workers compensation benefits terminate or suspend as a result of an insurer's insolvency would have to litigate to recover those benefits from his employer, or if the employer has ceased to exist, he would have to litigate against his employer's successor in interest. The elimination of the costs and delay of this litigation is particularly significant because it is eliminated for those least likely to be able to prosecute the claim. A byproduct of DIGA's existence and the consequential elimination of excessive delay in payments to claimants is that the

23. 18 *Del. C.* § 4202.

24. 18 *Del. C.* § 4206.

25. 18 *Del. C.* § 4208.

26. 18 *Del. C.* § 4205(9).

27. 18 *Del. C.* § 4208(a)(3).

28. *Global Santa Fe Corp. v. Texas Property & Cas. Ins. Guaranty Assoc.,* 153 S.W.3d 150, 154 (Tex.App.2004); National Conference of Insurance Guaranty Funds, Necessary Reforms to Strengthen State Property and Casualty Insurance Guaranty Funds to Meet the Challenges of the 21st Century at 17. *http:// www.ncig f.org/Legislati on/BTFReport FinalPDF.pdf* (last visited November 9, 2005).

29. *See Huffman v. C.C. Oliphant & Son,* 432 A.2d 1207, 1211 (Del.1981) (stating " 'wages' must be construed to include claims based on unpaid workmen's compensation benefits due after proper demand therefor has been made.").

30. 19 *Del.C.* § 2357 states "[i]f default is made by the employer for 30 days after demand in the payment of any amount due under this chapter, the amount may be recovered in the same manner as claims for wages are collectible."

31. 19 *Del. C.* § 1103(b).

32. 19 *Del. C.* § 1113(c).

33. 19 *Del. C.* § 1101(4).

employer or the employer's successor also benefits because the potential additional liability associated with a wage payment claim, including costs and attorney fees is avoided.

### 4. The timing of when the obligation is created supports the conclusion that CCHS is liable to DIGA as an insured under § 4211.

As one of the two net-worth provisions, § 4211(a)(2) grants DIGA the right to recover the amount of any covered claim paid for "[a]ny insured whose net worth on December 31 of the year immediately preceding the date the insurer becomes an insolvent insurer exceeds $25 [million]...."[34] The time an insured's net-worth is determined, therefore, does not contemplate the continued existence of the insured, but considers only the financial status of the insurer. To conclude that the General Assembly intended to undermine the strong public policy, "clearly expressed in law, which holds that the obligations of the extinguished corporation in a merger survive as obligations of the surviving corporation,"[35] simply because the obligation is contingent on the insolvency of the insurer "would lead to unjust and mischievous consequences."[36] The successor in interest could enforce an insurance policy against an insurer by paying premiums on the assumed policies,[37] yet avoid the obligation every other insured statutorily carries if that same insurer where to be declared insolvent.

It is true that some courts have recognized that a corollary purpose of the net-worth provision has been to encourage intelligent selection of insurers by those with the means to be cautious;[38] and it has been argued that because a successor in interest by way of merger did not have an opportunity to intelligently select the insurer of an assumed policy the successor should not be burdened by a poor choice. To take this position, however, would be to encourage an inequitable result because a successor in interest benefits from the policy and also by the Act. Moreover, given that the financial collapse of even the largest and seemingly most stable businesses has been unpredictable, to place the corollary purpose of the net-worth provision above its primary function is not prudent. This result would exchange a critical component of DIGA's operational resources for some speculative gain.

### III.

Nothing in the record—the structure of the merger, the merger agreement, actions taken after the merger, or otherwise— demonstrates any reason to reach a conclusion other than that CCHS assumed all the rights, obligations, and liabilities associated with Riverside's insurance policies with PHICO. CCHS paid the policy premiums and, based on this relationship, PHICO would have been obligated to perform under the policy, and in fact did perform for CCHS's benefit until the time

---

**34.** 18 *Del. C.* § 4211(a)(2).

**35.** *Western Air Lines, Inc. v. Allegheny Airlines, Inc.*, 313 A.2d 145, 154 (Del.Ch.1973).

**36.** *Nationwide Mut. Ins. Co. v. Krongold*, 318 A.2d 606, 609 (Del.1974).

**37.** "Any other rule simply would create a trap which could be used as a convenient device to work a forfeiture when it was to the interest of the insurer to invoke the express provisions

of the policy and permit it to waive such provisions and collect the premium when it was to its interest to do so." *Minnick v. State Farm Mut. Auto. Ins. Co.*, 174 A.2d 706, 714 (Del.Super.1961) (citing *Seavey v. Erickson*, 244 Minn. 232, 69 N.W.2d 889 (1955)).

**38.** *Harold Ives Trucking Co. v. Pickens*, 355 Ark. 407, 139 S.W.3d 471 (2003).

of PHICO's insolvency despite the fact that Riverside continued to be the "named insured." When PHICO became insolvent and, therefore, became unable to pay claims against Riverside, DIGA operated as the General Assembly designed and DIGA stepped in to make timely payments to claimants preventing financial hardships to those least able to absorb their losses.

CCHS stipulated that its net-worth exceeded $25 million on December 31, 2001, the year before PHICO's declared insolvency. It is of no consequence that at the time of the merger Riverside did not have a net-worth of $25 million. Any number of business transactions could have occurred during the seven years between the time of the merger and PHICO's insolvency. And any of those may have resulted in an increase or decrease in Riverside's net-worth, or its continued legal existence as of December 31 of the year before PHICO's insolvency.

Therefore, given that CCHS succeeded Riverside and assumed Riverside's future workers compensation liability, regardless of the source; that CCHS could enforce the rights as "an insured" under PHICO's policy; that CCHS benefited from DIGA's existence; and, that CCHS's net-worth exceeded $25 million on December 31 of the year before PHICO's declared insolvency, together with a strong policy for the obligations of extinguished corporations in a merger to survive as the obligations of the surviving corporation, we must conclude that CCHS is covered as "any insured" under § 4211. Consequently, CCHS must reimburse DIGA for the claims DIGA paid on its behalf and, as the statute requires, bear the burden of PHICO's insolvency.[39]

---

**39.** CCHS also made the argument before the Superior Court and again before this Court that DIGA failed to satisfy the "second prong" of § 4211(a)(2)a and therefore DIGA was not entitled to reimbursement. The Superior Court judge declined to reach this argument because she decided that CCHS was not an insured under the statute and therefore ruled in favor of CCHS. As noted above, § 4211(a)(2)a provides that DIGA "shall have the right to recover from the following persons the amount of any covered claim paid on behalf of such person pursuant to this chapter: ... Any insured whose net worth on December 31 of the year immediately preceding the date the insurer becomes an insolvent insurer exceeds $ 25,000,000 *and whose liability obligations to other persons are satisfied in whole or in part by payments made under this chapter."*

Without citing any authority whatsoever, and, it appears, almost as an afterthought, CCHS argues that the phrase "liability" in the statute is meant to distinguish from other types of claims such as first party claims. CCHS continues by arguing that worker's compensation claims are not usually considered liability claims, because the payment of benefits does not depend on fault, but rests solely upon the employment with the insured. CCHS notes that, "one must question wheth-er, pursuant to the terminology used in the statute, Ms. Euston's claim is a 'liability' obligation" at all. Finally, CCHS argues that the liability obligations must be to "other" persons: "the language of the paragraph seems to indicate that DIGA must satisfy obligations to persons other than Ms. Euston, on behalf of Riverside (or CCHS, if it is considered the insured), in order to be eligible to recover the amounts paid on the covered claim.... In this instance, DIGA has not made any showing that it has satisfied liability obligations on behalf of Riverside or CCHS (excluding Ms. Euston's claim) in order to entitle it to recovery under this section." We disagree with these arguments.

Construing the statute liberally to effect its purpose, there is no reason not to conclude that "liability" includes liability to an injured employee under the workers' compensation statute. Moreover, we think that the "other" language describing "persons" in the statute, given the context, simply describes "persons" other than the insured, particularly when "person" is a defined term under § 4205(10). ("DIGA shall have the right to recover from the following *persons* the amount of any covered claim paid on behalf of such *person* pursuant to this chapter: any insured whose net worth ... exceeds [$25 Million] and whose [the insured's] liability obligations to

## IV.

The judgment of the Superior Court is **REVERSED** and **REMANDED** to the Superior Court for proceedings consistent with this opinion.

---

*other persons* [i.e., persons other than the insured] are satisfied ... by payments made under this chapter.") In this case, DIGA paid to satisfy CCHS's liability obligation (that it "inherited" as a result of the merger with Riverside) to Euston. We are satisfied that this meets the requirements of the "second prong" of § 4211(a)(2)a.