B.F. RICH & CO., INC., a Delaware corporation, Plaintiff Below, Appellant,

v.

Richard E. GRAY, Sr., individually, Defendant Below, Appellee,

and

Rich Realty, Inc., a Delaware corporation, Nominal Defendant Below, Appellee.

No. 617, 2006.

Supreme Court of Delaware.

Submitted: April 4, 2007.
Decided: Sept. 11, 2007.

Michael F. Bonkowski (argued), Norman L. Pernick and Kimberly L. Gattuso, Esquires, of Saul Ewing, LLP, Wilmington, Delaware; for Appellant.

Henry A. Heiman, Esquire, of Heiman Gouge & Kaufman, LLP, Wilmington, Delaware; for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice.

Two minor children, who reside in Connecticut, own 49% of the stock of a Delaware corporation. The father of those minor children voted that stock to gain operational control of that corporation without having first been appointed as guardian of his children's estate (property). A Connecticut statute requires the appointment of a guardian of a minor's estate where a parent receives or uses property of the minor child having a value exceeding $10,000.[1] The value of the minor children's shares exceeds $10,000. The sole question of substance on this appeal is whether the father's voting of the minor children's shares constituted a "use" of those shares within the meaning of the Connecticut guardianship statute, thus requiring the appointment of a guardian of the minor children's estate to vote the shares. We hold that the father's voting of those shares constituted a "use" of the shares within the meaning of that statute. As a consequence, the voting of the children's shares by anyone other than a court-appointed guardian was invalid, with the result that less than a majority of the corporation's shares were validly voted and the written consent action had no legal force. Because the Court of Chancery reached a contrary result, we reverse and remand.

The plaintiff below-appellant, B.F. Rich & Co., Inc. ("Rich"), is a minority stockholder of Rich Realty, Inc. ("Realty"), a corporation that is the subject of the control fight in this action. The Court of Chancery determined that Richard E. Gray ("Gray, Sr."); his adult daughter, Carson Gray; and his brother, B. David Gray; properly voted a majority of Realty's outstanding shares, thereby validly electing themselves as the *de jure* directors and officers of Realty.[2] On or about December 6, 2005, Realty was served with an "Action by Consent of the Shareholders of Rich Realty, Inc.," in which Gray, Sr. and Carson Gray were elected as the new directors of Realty (the "2005 Shareholder Consent"). Realty was also served with an "Action by Unanimous Consent of the Directors of Rich Realty, Inc." whereby Gray, Sr., Carson Gray, B. David Gray and another person were appointed as Realty's new officers. In both written consents, Gray, Sr. voted his minor children's shares, which represented 49% of Realty's outstanding stock.

Thereafter, Rich, as a Realty stockholder, brought this action under 8 *Del. C.*

---

**1.** Connecticut General Statutes, Section 45a–631(a).

**2.** Rich and Realty are both Delaware corporations.

§ 225[3] in the Court of Chancery. Rich sought a declaratory judgment that Gray, Sr.'s consent action to remove Realty's incumbent directors and officers, and to elect himself and his relatives as Realty's sole directors and officers, was invalid. The basis for Rich's claim was that under Connecticut law, only a court-appointed guardian of the property of Gray, Sr.'s minor children could lawfully vote the children's stock for that purpose. On November 9, 2006, after a trial, the Court of Chancery issued a Memorandum Opinion determining that Gray Sr. had properly voted his minor children's shares, that the written consents were legally effective, and that Gray, Sr., his daughter, and his brother were properly elected as Realty's *de jure* directors and officers.[4]

Rich appeals from the judgment implementing that Opinion. Upon reviewing the record and the applicable authorities, we conclude that in ruling that no guardian was required, the Court of Chancery reversibly erred.

## FACTS

### The Parties

Rich, whose principal place of business is Newark, Delaware, is a manufacturer and distributor of custom vinyl windows and aluminum storm products for the remodeling and new construction markets. Rich owns 18 shares, or 15.25%, of Realty's 118 outstanding shares, for which Rich paid $1 million. Rich also leases space from Realty in Newark. Until the date that Gray, Sr. purported to remove them

by the 2005 written consents, Rich's two officers, Richard Rebmann and George Simmons, were the officers of Realty as well.

Realty, the other corporate party, was formed on July 3, 1997 for the sole purpose of facilitating the acquisition of the Newark, Delaware property upon which Rich constructed the building that it now leases from Realty. That property and the lease revenue it earns represent Realty's only assets.

As noted above, Rich owns 18 shares of Realty. Gray, Sr. owns no stock in Realty and never has. Realty's other shareholders are: (1) Jepsco, Ltd.; (2) Adelia and Richard Gray, Jr., who are Gray Sr.'s minor children by Gray Sr.'s former wife, Sabele Foster; (3) Josslyn Gray, who is Gray Sr.'s niece and the minor daughter of B. David Gray; and (4) Carson Gray, who is Gray, Sr.'s adult daughter by a previous marriage. The chart below sets forth Realty's shareholders (other than Rich) and their respective shareholdings:

| STOCKHOLDER | NUMBER OF SHARES | OWNERSHIP % |
|---|---|---|
| Jepsco, Ltd. | 4 | 3.39 % |
| Josslyn Gray, minor | 9 | 7.62 % |
| Carson M. Gray | 29 | 24.58 % |
| Adelia H. Gray, minor | 29 | 24.58 % |
| Richard E. Gray, Jr., minor | 29 | 24.58 % |

The shares of the minor children, Adelia and Richard Gray, Jr., have been at all times owned outright and held in the children's own names.[5] The issuance of those

3. Rich brought its Section 225 action as Plaintiff, naming Gray, Sr. as the Defendant and Realty as a Nominal Defendant.

4. *B.F. Rich Co., Inc. v. Richard E. Gray, et. al.,* 2006 WL 3337163 (Del.Ch.) (cited herein as "Chancery Op.").

5. Because the minor children reside in Connecticut, all parties agree that the substantive issue in this case—whether a court-appointed guardian was required to vote the children's Realty shares in the manner in which they were voted here—is governed by Connecticut law.

shares to the minor children was not a gift under the Connecticut (or any other) Uniform Transfers to Minors Act.

Gray, Sr., the other principal actor, is a New York resident, and was an attorney and a member of the New York State Bar until his disbarment in 2002. In an unrelated proceeding, Gray, Sr. served two years in prison as a result of being held in contempt by the Supreme Court of New York. He also pled guilty to bankruptcy and tax fraud in the United States District Court for the Eastern District of Missouri. And, in 2004, the United States District Court for Delaware, per then-District Court (now Third Circuit Court of Appeals) Judge Kent A. Jordan, held Gray, Sr. liable for approximately $40 million for acts of corporate malfeasance.[6]

### Gray Sr.'s Efforts In 2004 To Vote His Minor Children's Realty Shares

As noted, the dispute here concerns whether, at the time he executed the 2005 Shareholder Consent, Gray, Sr. was lawfully authorized to vote his minor children's Realty shares. Although the 58 shares owned by Gray Sr.'s two minor children did not represent an absolute majority interest in Realty, those 58 shares were indispensable to anyone seeking to obtain voting control.[7] Hence, starting in 2004, Gray made various attempts to obtain and exercise the power to vote his minor children's Realty shares.

First, in August 2004, Gray, Sr. notified Rich by letter that he had exercised, on behalf of his minor children, a "Written Consent by Holders of In Excess of 50% of the . . . Outstanding Capital Stock in Lieu of Meeting." That consent was also signed by Carson Gray in her individual capacity. In the 2004 shareholder consent, the minor children (through Gray Sr.) and Carson Gray purported to remove the existing directors of Realty, and to replace them with Gray, Sr., B. David Gray, and Carson Gray, as Realty's new directors. Those persons also executed a "Written Action and Consent of Directors in Lieu of a Meeting of the Board of Directors," wherein they purported to discharge the current slate of officers and elect themselves (respectively) as Realty's President, Secretary, and Treasurer. Gray, Sr. then instructed the allegedly removed directors and officers to turn over certain company books and records in their possession.

In response, Rich, through its officers, Messrs. Rebmann and Simmons, questioned the validity of the 2004 shareholder consent, noting that none of the signatures on that consent had been verified or separately corroborated. Rich requested corroboration of the authenticity of the signatures. Correspondence between Gray, Sr. and Rich then ensued. In a letter dated September 1, 2004 (on Realty letterhead on which Gray, Sr. signed as the president of Realty), Gray, Sr. promised to provide evidence verifying the signatures appearing on the 2004 shareholder consent. Thereafter, Gray, Sr. provided what he represented were notarized certificates of

---

6. *Summit Metals, Inc. v. Richard E. Gray, et. al.,* 2004 WL 1812700 (D.Del.). As the Vice Chancellor stated in his Opinion, Judge Jordan "found that Gray, in his capacity as sole director of the company involved, violated his fiduciary duties by engaging in self-dealing transactions and usurping corporate opportunities." Chancery Op., 2006 WL 3337163, at *3.

7. Adelia Gray and Richard Gray, Jr. together own 58 of Realty's 118 outstanding shares, which represent 49.1% of Realty's voting power. Those 58 shares, when combined with Carson Gray's 29 shares, total 87 shares, or 73% of Realty's voting power. Because Carson Gray was allied with her father (who owned no Realty shares), to obtain majority control of Realty it was essential that Gray, Sr. obtain the right to vote his minor children's 58 shares.

the shareholders confirming and verifying their respective signatures. The certificate that was signed by Gray Sr. and dated October 5, 2004, stated:

As the father of both [Adelia Gray and Richard Gray, Jr.], I have full legal right and authority to take various actions on their respective behalves, including, without limitation, the execution and delivery to all parties whom I deem necessary and/or appropriate, of all such legal and other documents as I may deem necessary and/or appropriate to protect their respective legal rights and interests in respect of all property owned by each of them.

On or about October 21, 2004, Rich responded by letter, rejecting Gray, Sr.'s claim that he had authority to speak for his minor children, and inviting Gray, Sr. to provide additional evidence of his authority to act on their behalf in this matter. Gray, Sr. never responded. Instead, he abandoned his efforts to take control of Realty in reliance upon the 2004 shareholder consent, and sought to achieve that goal in a different way.

### Gray, Sr.'s Effort To Be Appointed As The Guardian of His Minor Children's Estates

During 2005, Gray, Sr. was involved in a contested divorce proceeding with his ex-wife, Sabele Foster, in the Connecticut Superior Court. The divorce proceeding was not resolved until December 10, 2005, under circumstances that are later described.

While the divorce proceeding was ongoing, Gray, Sr. attempted a second strategy to obtain the right to vote his minor children's Realty shares. In July 2005, he filed in the Probate Court for the State of Connecticut a petition seeking his appointment as guardian of his minor children's estates, specifically their Realty shares. A guardian *ad litem* on behalf of the minor children (the "Guardian") was then appointed. On August 24, 2005, the Guardian filed with the Connecticut Probate Court a report (the "Report") responding to the petition on behalf of the minor children. In her Report, the Guardian stated:

I have also spoken with Ms. Sabele Foster, Mr. Gray's ex-wife. [Foster] expressed serious concerns regarding Mr. Gray being given control of their children's money.... She reports that their marital settlement is still being negotiated in Middlesex Superior Court ... [and] ... that one of the issues being discussed in Superior Court is the same issue as petitioned for here. She also reports that Mr. Gray is currently suing her in New York State regarding the property that was awarded her in Middlesex Superior Court. She reports that both she and her elderly parents currently have to contest this action at great cost ... [and] that the money being used in that lawsuit to fight over this property (in New York) is also money that would be better used toward the children's college costs.

Ms. Foster also expressed concerns regarding Mr. Gray's daughter Carson due to events that have occurred in the past. She believes that Carson will essentially work solely for Mr. Gray's interests ... [and that] ... Mr. Gray's brother David would not be a neutral party either. She has concerns that having Mr. Gray, his daughter Carson (a stockholder) and his brother David (the father of another stockholder) appointed as directors [of Realty] would give them the ability to do anything they wish with Adelia and Teddy's money. She suspects that choices might be made that would not be in the children's best interests. She believes that Mr. Gray, Carson, and David have significant conflicts

of interest in this matter. Essentially, Ms. Foster does not wish for Mr. Gray to control their children's money.

The Guardian also discussed in some detail her concerns regarding Gray, Sr.'s ability to discharge faithfully his fiduciary duties as guardian of his minor children's property:

> The undersigned has obtained a copy of Judge [Elaine] Gordon's decision at the dissolution hearing on August 12, 2003. Judge Gordon found Mr. Gray to be less than forthcoming in his financial disclosure, in fact she found there to be almost no disclosure even after thirteen months of notice. The only evidence before the court that date was an unsworn financial affidavit filed by Mr. Gray, hence the court's financial findings were all estimates based on what little evidence was before it.... According to his unsworn financial affidavit, Mr. Gray claimed to be making [$36,000] per year, yet the expenses he had paid that year, not counting legal costs for his dissolution attorney, criminal defense attorney, and business attorneys, were [$86,000]. Hence the court assigned him a higher earning capacity. One of Mr. Gray's financial affidavits in the dissolution file showed an outstanding debt of approximately $14 million dollars.

The Guardian concluded her Report thusly:

> Mr. Gray maintains that he simply wishes to protect his children's interests via this petition.... If what he is alleging is indeed true, then it makes sense

for him to wish to gain control of this corporation to protect his children's interests. Unfortunately however, there is evidence in the dissolution file that Mr. Gray has been less than truthful in the past, particularly as pertaining to business matters.[8] The undersigned does not feel therefore, that she can formulate what is in the children's best interests by simply relying on Mr. Gray's statements. And although I have no doubt that Mr. Gray is an accomplished business person, there is evidence in the dissolution file that his choices regarding business deals in the past apparently led to incarceration.... However, ... I have been appointed to represent the children's [interests], and must do so with whatever evidence is before me. Mr. Gray has provided no evidence ... other than verbal allegations. In light of the history and circumstances of this case, I would need more.... As a representative for the children's best interests ... I am hesitant to recommend that Mr. Gray be made guardian of his children's estate, especially when these estates may involve significant assets and Mr. Gray shows evidence of significant personal debt.[9]

Shortly after the Guardian's Report was submitted, Gray, Sr. withdrew his application to be appointed as guardian of his minor children's estates. That, however, did not deter his effort to obtain the right to vote his children's Realty shares. Gray,

---

**8.** At a hearing held on August 12, 2003 on issues relating to the divorce proceeding, the Middlesex Superior Court found that Gray, Sr. had never disclosed certain items of valuable property to his former wife or to the court "as part of his pattern of deceit and deception." Continuing further, the Connecticut Superior Court Judge commented about Gray, Sr. that "[t]here is no spirit of observ-

ance of the law, the power of the Court, or the goal of this proceeding, which is to do equity."

**9.** The Report pre-dates Judge Jordan's decision holding Gray, Sr. liable for approximately $40 million in damages for acts of corporate malfeasance.

Sr. merely adopted a different strategy, which gave rise to this lawsuit.

### Gray, Sr. Negotiates A Stipulation With His Former Wife As The Basis To Assert His Power To Vote His Minor Children's Shares

As the Guardian reported to the Connecticut Superior Court, Gray, Sr. was suing his former wife, Ms. Foster, in New York over property she had been awarded in the divorce proceeding. According to the Report, Ms. Foster and her elderly parents were contesting that lawsuit at considerable personable expense. Ultimately, Gray, Sr. and Ms. Foster negotiated a settlement that was embodied in a formal post-judgment Stipulation executed on September 11, 2005 (the "Stipulation"). In that Stipulation, Gray, Sr. dismissed the New York litigation and conferred other benefits upon Ms. Foster,[10] in exchange for which Ms. Foster agreed not to oppose or object to any effort by Gray, Sr. to pursue the minor children's rights in their Realty shares, including the right to vote those shares. The critical portion of that Stipulation provides that:

7. [Gray, Sr.] will have the right to pursue, and will pursue without any active involvement on the part of [Foster], the rights of the minor children Adelia and Teddy [Richard E. Gray, Jr.], by virtue of their respective ownerships of the capital stock of Rich Realty, Inc. At [Foster's] request, [Gray, Sr.] shall keep [Foster] or a representative designated by [Foster] periodically advised as to the status of his efforts on the children's behalf. [Foster] will not oppose any motions or other court proceedings initiated by [Gray, Sr.] on behalf of the children, for the purpose of pursuing the aforementioned rights on behalf of the minor children and will execute any documents necessary to such pursuit with respect thereto as requested by [Gray, Sr.] or his representatives. [Gray, Sr.] will indemnify and hold [Foster] harmless from and against any liability or other obligations relating to his efforts on behalf of the minor children and any document execution [sic] by [Foster].

### The 2005 Shareholder Consents and The Purported Change of Control

Three months later, on or about December 6, 2005, the 2005 Shareholder Consent executed on November 26, 2005 by Gray, Sr. on behalf of his minor children, was served on the registered agent of Realty. The 2005 Shareholder Consent—also signed by B. David Gray on behalf of his

---

**10.** The Stipulation provides, *inter alia*, that:
1. [Gray, Sr.] shall withdraw forthwith all pending appeals and legal actions filed by him and/or any corporations on his behalf against [Foster] or any of her family members. [Gray, Sr.] shall also sign a release with respect to any future such litigation, except as to rights and/or disputes that may arise out of the [Decision] dated 8/12/2003 ... as modified by this Stipulation, and/or matters the subject of this Stipulation not addressed in the Stipulation. [Foster] will sign a similar release.
2. Within 7 days of the date on which this Stipulation is entered as an order of [the] court, [Gray, Sr.] shall provide to counsel for [Foster] executed letters addressed to those entities (such as Doyle, Christies, Gander & White and Latham) holding property being claimed by either [Gray, Sr.] or various corporations with which he is affiliated or owns, releasing his or the relevant corporation's or entity's claim to the items held in their possession, and confirming [Foster's] right to the same, except as provided below. [Foster] and her counsel shall release such letters to such entities when and as she chooses.

minor child, Josslyn Gray; and by Carson Gray in her individual capacity—purported to oust Realty's current directors and to elect Gray, Sr. and Carson Gray as the new Realty board.

Realty was also served with an "Action by Unanimous Consent of the Directors of Rich Realty, Inc.," dated November 26, 2005, in which Gray, Sr. and Carson Gray purported to terminate the incumbent officers of Realty and (among other things) to appoint Gray, Sr. as President and Treasurer and Carson Gray as Vice President. By letter dated December 13, 2005, counsel for Carson Gray informed Richard K. Rebmann and George W. Simmons that they were terminated as officers of, and were no longer authorized to speak for, Realty.

In response, Rich again demanded proof of Gray, Sr.'s authority to act on behalf of his minor children. Gray, Sr. then furnished Rich with a redacted copy of the Stipulation. It is undisputed, and the Court of Chancery found, that the Connecticut Superior Court-approved Stipulation is the sole basis of Gray, Sr.'s claim of authority to exercise the right to vote his minor children's Realty stock.[11]

### The § 225 Action And The Court of Chancery Rulings

After receiving service of the 2005 Shareholder Consent, on January 20, 2006, Rich brought this action under 8 *Del. C.* § 225, seeking a declaration that the Consent was invalid, and a determination of the *de jure* directors and officers of Realty. Rich's principal claim was that the 2005 written consents were invalid because Gray, Sr. lacked the authority under Connecticut law to vote his children's shares. Rich advanced several arguments in support of that claim. Specifically, Rich contended that: (a) Ms. Foster had no right under Connecticut law to "assign" or "transfer" her children's voting rights to Gray, Sr. in the Stipulation; (b) the order approving the Stipulation exceeded the Connecticut Superior Court's jurisdiction, for which reason that order was not entitled to full faith and credit; (c) the Stipulation did not appoint Gray, Sr. as guardian for the estate of his minor children; and (d) in all events, the voting of the minor children's stock by Gray, Sr. constituted a "use" of their stock that triggered the Connecticut statutory requirement that Gray, Sr. first be appointed as guardian of his children's estate.[12]

The Court of Chancery rejected all these arguments. Holding that both 2005 written consents were valid, the Court ruled that: (1) as a stranger to the divorce proceedings and having no legally protected interest adversely affected, Rich had no standing under Connecticut law (and, therefore, no standing in this case) collaterally to challenge the validity of the Stipulation; (2) even if Rich had standing, the Connecticut Superior Court did not exceed its jurisdiction by entering the order approving the Stipulation; which, therefore, was entitled to full faith and credit; (3) the Stipulation neither transferred nor assigned to Gray, Sr. the voting rights in his children's shares. Because Gray, Sr. and Ms. Foster, as parents of the minor children, could lawfully have voted the shares on their children's behalf, the only effect of the Stipulation was to bind Ms. Foster contractually to her decision not to exercise her right to vote those shares or oppose Gray, Sr. exercising that voting right on their children's behalf; and (4) Gray Sr.'s voting his minor children's Realty shares did not constitute a "use" of a

---

**11.** Chancery Op., 2006 WL 3337163, at *2.

**12.** Connecticut General Statutes, Section 45a–631(a).

valuable asset of the children that triggered the requirement, under the Connecticut guardianship statute, that a guardian of the children's estate be appointed.

This appeal followed.

## ANALYSIS OF THE CLAIMS OF ERROR

■ On appeal, Rich claims that the Vice Chancellor committed reversible error by determining that: (i) Rich lacked standing to collaterally attack the Stipulation; (ii) the Connecticut Superior Court did not exceed its jurisdiction when entering the order approving the Stipulation; (iii) that order was entitled to full faith and credit; (iv) the Stipulation did not confer upon Gray, Sr. any voting rights that he, as the minor children's parent, did not already have; and (v) Gray, Sr.'s voting of his minor children's shares was not a "use" of his children's property that required the prior appointment of a guardian of the children's estate under Connecticut law. Because the facts material to these claims are uncontroverted, the issues presented are all essentially questions of law that this Court reviews *de novo*.[13]

Having considered the issues raised on this appeal, we conclude that only the fifth presents an issue of substance. The substantive issue is whether the Connecticut guardianship statute, as applied to these facts, required the appointment of a guardian of the estates of the minor children before their Realty stock could be voted in the manner set forth in the 2005 Shareholder Consent. Rich's other four claims are procedural, in that they involve a collateral attack upon the Connecticut Superior Court order approving the Stipulation. Those procedural claims are readily disposed of, because they rest on an incorrect premise. For that reason we first address the collateral attack issues and then turn separately to the remaining issue of substance.

■ Preliminarily, we note that the basis of this action is 8 *Del. C.* § 225, a statute that empowers the Court of Chancery to determine the validity of any election, appointment, removal or resignation of any director or officer of a Delaware corporation, and the right of any person to hold or continue to hold such office.[14] Section 225 also authorizes inquiry into the validity of actions taken by written consent.[15] The scope of a Section 225 action, however, is not unlimited, and embraces only issues that are pertinent to determining the validity of the election[16]—in this case, the validity of the written consents themselves.

### The Collateral Attack Issues

■ Rich first contests the Court of Chancery's determination that Rich lacked standing to attack collaterally the Stipulation and the Connecticut Superior Court order approving it. The Vice Chancellor held that Rich had no standing to attack that order under Connecticut law, because

---

13. *Oceanport, Industries, Inc. v. Wilmington Stevedores,* 636 A.2d 892, 899 (Del.1994); *Scharf v. Edgcomb Corp.,* 864 A.2d 909, 916 (Del.2004) (stating that where the facts are admitted or established, the issue is " 'whether the rule of law as applied to the established facts is or is not violated,' " (quoting *Pullman–Standard v. Swint,* 456 U.S. 273, 289, n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)); *Delaware Ins. Guar. v. Christiana Care,* 892 A.2d 1073, 1076 (Del.2006) (questions of statutory construction are reviewed *de novo).*

14. Chancery Op., 2006 WL 3337163, at *4 and authorities cited at n. 25.

15. *Id.* at n. 26.

16. *Loudon v. Archer–Daniels–Midland Co.,* 1996 WL 74730, at *3 (Del.Ch.), *aff'd,* 700 A.2d 135 (Del.1997).

Rich was not a party to, and had no cognizable interest in, that proceeding. Consequently, Rich also lacked standing to mount that collateral attack in a Section 225 Chancery proceeding. That ruling is correct as a matter of both Connecticut and Delaware law.

■ As the Vice Chancellor correctly held, "[i]n Connecticut a person not a party to prior divorce proceedings has no standing to attack collaterally the divorce decree where the person has no legally protected interest adversely affected by the decree itself at the time it was rendered." [17] Noting that the Delaware law on standing is similar,[18] the Vice Chancellor concluded that in this case:

"... Rich failed to identify any legally protected interest it had in the Stipulation between Foster and Gray [Sr.] when the Connecticut Superior Court granted it.... Rich was a stranger to the divorce proceedings and had no interest in the divorce or standing to participate in those proceedings. Furthermore ... Rich's challenge to the Stipulation is not based on a wrong committed against it.[19]

■ In the alternative, the Court of Chancery ruled that even if Rich had standing to attack collaterally the Superior Court order approving the Stipulation, the attack had no merit. That alternative ruling is also correct.

Rich claims that, in approving the Stipulation, the Connecticut Superior Court exceeded its jurisdiction. The Stipulation,

therefore, was not entitled to full faith and credit, and the Court of Chancery erred in holding otherwise. Rich's argument runs as follows: the Stipulation was *ultra vires*, because it conferred upon Gray, Sr. the power to vote their minor children's Realty stock—a power that neither Gray, Sr. nor Ms. Foster could exercise without first being appointed guardian(s) of their children's estate. By approving the Stipulation, the Connecticut Superior Court implicitly validated Gray, Sr.'s and Ms. Foster's status as guardians. The Superior Court had no power to do that, because only the Connecticut Probate Court is empowered to appoint a guardian of a minor's estate. The Connecticut Superior Court having had no jurisdiction to approve the Stipulation, the Vice Chancellor erred by according the Stipulation legal force and effect in this Section 225 action.

■ This argument fails for two separate, though interrelated, reasons. First, it rests on the erroneous premise that the Stipulation "transferred" or "assigned" to Gray, Sr. Ms. Foster's power to vote the minor children's Realty shares. In fact, the Stipulation did no such thing. It merely documented and rendered enforceable Ms. Foster's promise not to interfere with, or oppose, any efforts by Gray, Sr. to pursue their minor children's rights (including voting rights) in the Realty shares. As the Vice Chancellor pointed out, both parents already possessed the right to vote the Realty shares on their minor children's behalf, subject only to the Connecticut

---

**17.** Chancery Op., 2006 WL 3337163, at *9 (citing *Tippin v. Tippin,* 148 Conn. 1, 166 A.2d 448, 450–51 (1960); *Tyler v. Aspinwall,* 73 Conn. 493, 47 A. 755, 756 (1901); and *Fattibene v. Fattibene,* 183 Conn. 433, 441 A.2d 3, 5 (1981)).

**18.** *Id.* ("In the absence of a specific statutory grant of review, the test for standing, set forth most recently in *Dover Historical Society v.* *City of Dover Planning Commission*[, 838 A.2d 1103 (2003) ], provides that a plaintiff or petitioner must demonstrate first, that he or she sustained an 'injury in fact'; and second, that the interests he or she seeks to protect are within the zone of interests to be protected.") (internal citations and footnote omitted).

**19.** *Id.* (emphasis omitted).

guardianship statute, if applicable. Thus, the premise that the Stipulation "transferred" or "assigned" to Gray, Sr. the children's voting rights in the stock is unfounded.

■■■■ Second, Rich's collateral attack argument rests upon the premise that the Connecticut Superior Court order approving the Stipulation operated as a *sub silentio* appointment of Gray, Sr. as guardian of his minor children's estate. That premise is also unfounded, because it mischaracterizes the order. The only effect of that order was to approve a negotiated settlement of the Connecticut divorce proceeding. That any court having jurisdiction over a dispute is empowered to approve a binding settlement of that dispute, is a proposition so basic as to require no citation. No party disputes that the Connecticut Superior Court possessed jurisdiction to adjudicate issues relating to the divorce of Gray, Sr. and Ms. Foster, and the Vice Chancellor correctly so recognized.[20]

\* \* \* \*

■■■■ For the above reasons, the Court of Chancery properly rejected Rich's collateral attack upon the Stipulation and the Connecticut Superior Court order approving it, and accorded the Stipulation the full faith and credit to which it was entitled under Connecticut law. The Vice Chancellor also correctly determined that neither the Stipulation nor the order created or vested in Gray, Sr. any voting rights that he, as the minor children's parent, did not already possess. As a consequence, only one substantive legal issue remained for decision: whether in these specific circumstances, Connecticut statutory law required that Gray, Sr. be appointed as guardian for his minor children's estate(s) before he could lawfully exercise his parental right to vote their Realty shares in the manner set forth in the 2005 Shareholder Consent. The Court of Chancery answered that question in the negative. Therefore, the only issue left for us to decide is whether in so ruling the Court of Chancery erred. That issue being one of statutory construction, our review is *de novo*.[21]

### The Merits of Rich's Guardianship Claim

■■■■ We first pause to place Rich's guardianship claim into its proper legal context. Connecticut law distinguishes between two types of guardianship for minors: a guardian of a minor's person and a guardian of a minor's estate. A guardian of the person has the right to custody and responsibility for the care of the minor. Under Section 45a–606 of the Connecticut statute, the father and mother of a minor child are automatically recognized as joint guardians of the person of the minor. A guardian of the estate manages the property of the minor, other than property

---

20. The Vice Chancellor held (Chancery Op., 2006 WL 3337163, at \*12):

In this case the [Connecticut] Superior Court had exclusive jurisdiction to assess and approve the divorce proceeding and could have transferred this portion of the Stipulation (which explicitly deals with the Rich Realty stock) to the Probate Court had it found it necessary to do so. Instead, the Superior court approved the Stipulation as presented. Without evidence casting material doubt on the Superior Court's approval of the Stipulation, this Court is reluctant to second guess a Connecticut court of competent jurisdiction on a novel issue of Connecticut law. Consequently, I reject [Rich's] argument that the Superior Court lacked jurisdiction to approve the Stipulation entered in Foster and Gray's divorce proceeding.

21. *Delaware Insurance Guaranty Assoc. v. Christiana Care Health Services, Inc.*, 892 A.2d 1073, 1076 (Del.2006).

managed under the Uniform Transfers to Minors Act. The statutory sections that govern guardianships of a minor's estate, however, contain no provision parallel to Section 45a–606 that would recognize the father and mother as the default joint guardians of a minor's estate.[22]

The basis for Rich's claim—that only a court-appointed guardian may lawfully vote the minor children's Realty shares as set forth in the 2005 Shareholder Consent—is Connecticut General Statutes Section 45a–631(a) ("Section 631(a)"). That statute pertinently provides:

> A parent of a minor, guardian of the person of a minor or spouse of a minor shall not *receive or use* any property belonging to the minor in an amount exceeding ten thousand dollars in value unless appointed guardian of the estate of the minor, except that such parent, guardian or spouse may hold property as a custodian under the provisions of [The Uniform Transfers to Minors Act] without being so appointed.[23]

It is undisputed that the value of the "property" at issue (the minor children's Realty shares) exceeds $10,000, and that Gray, Sr.'s minor children have never held their Realty shares subject to the Uniform Transfers to Minors Act. Thus, the legal issue narrows to whether Gray, Sr.'s voting his minor children's shares to oust Realty's incumbent directors, and to elect himself and his adult daughter as Realty's directors and officers, constituted a "use" of the minor children's Realty shares under Section 631(a). We hold that it was.

First, we agree with the Court of Chancery's construction of the term "use" in Section 631(a). The Vice Chancellor correctly noted that "[v]ery few cases have interpreted this section, and in particular, the phrase "receive or use," but:

> In each of those cases, however, a court appointed a guardian of the estate of the minor where a minor was entitled to financial or real property through the court system and where underlying policy required procedural protections to ensure proper oversight. Connecticut courts have held, for example, that a parent must obtain court approval to settle a personal injury claim by a minor if the amount of that claim exceeds $10,000. Similarly, a court must appoint a guardian of the estate when a minor receives monetary damages resulting from a personal injury claim. Though a minor is entitled to full enjoyment and immediate possession, the use of the injury recovery must be exercised by a guardian of the estate. The probate court will appoint a guardian of the estate when a minor child obtains a tort recovery to ensure that the award is conserved for its proper purposes or receives monies through probate. Connecticut courts do not apply § 45a–631 to child support because they treat that as a payment to the mother and not [as] the minor child's property.[24]

■ As the Vice Chancellor recognized, Connecticut cases distinguish between the parent's right to (i) bring or prosecute a money damages action on a

**22.** *See* Chancery Op., 2006 WL 3337163, at *5 and Connecticut authorities cited therein.

**23.** (italics added).

**24.** Chancery Op., 2006 WL 3337163, at *5 (citing *Saccente v. LaFlamme*, 2003 WL 21716586 (Conn.Super.2003); *Coakley v. Silvermine Farm, Inc.*, 1994 WL 34209 (Conn.Super.1994); *Lametta v. Conn. Light & Power Co.*, 139 Conn. 218, 92 A.2d 731 (1952); *Langs v. Harder*, 165 Conn. 490, 338 A.2d 458 (1973); *United States Trust Co. v. Bohart*, 197 Conn. 34, 495 A.2d 1034 (1985); and *Steinmann v. Steinmann*, 121 Conn. 498, 186 A. 501 (1936)).

minor child's behalf and (ii) to receive or use the monetary recovery resulting from that action. Thus, in *Lametta v. Connecticut Light & Power Co.,*[25] the Connecticut court, construing an earlier version of Section 631(a), rejected the argument that the potential recovery was sufficiently high as to require that a father be appointed as guardian of his minor child's estate in order to prosecute a lawsuit on the child's behalf. Observing that the statute did not preclude an action by a next friend under common law, and that the powers and responsibilities of a next friend and those of a guardian of the estate were the same, the Connecticut court upheld the father's standing to pursue his minor child's claims. Thus, the Vice Chancellor concluded, under *Lametta,* "[i]t is only upon the date of a judgment in the minor's favor that the rights must be exercised by an appointed guardian of the estate."[26]

*Doe v. City of Waterbury,*[27] also addressed by the Court of Chancery, further illuminates the distinction between prosecuting a lawsuit on a minor's behalf (which does not require appointment of a guardian of the minor's estate) and receiving or using the proceeds of that lawsuit (which does). *Doe* was a tort action filed in federal court by Jane Doe and Susan Roe on behalf of their respective minor children. Thereafter, the Connecticut Superior Court appointed the Commissioner of the Department of Children and their Families as legal guardian of the person of the children. The Commissioner, as guardian, sought to intervene in the federal court action and to be substituted for Doe and

Roe, claiming that the parents would wrongfully obtain or misuse any recovery. Denying the motion, the federal court concluded that Section 631(a) afforded sufficient protection against any misuse of funds by the parents, since a guardian of the minor's estate would have to be appointed before "the receipt of any recovery."

Summarizing the teaching of these cases, and of an earlier case, *Ryle v. Reedy,*[28] the Vice Chancellor accurately concluded that the case law reflected the Connecticut courts' concern that "in certain situations there is a greater risk that the holder of a minor's property will fail to use it for its proper purpose." Accordingly, the Connecticut courts have required the "appointment of a guardian for the estate of a minor when a liquid asset, such as cash, is received."[29]

Applying this teaching to the facts at bar would have been non-problematic had this case involved Gray, Sr. bringing a lawsuit seeking a monetary recovery on behalf of his minor children. But, it does not. Rather, this case involves a father's effort to vote his minor children's stock to place himself (and his close relatives) in control of a corporation, 49% of whose shares are owned by the minor children. Neither the parties nor the Court of Chancery could identify any Connecticut case addressing the applicability of Section 631(a) to voting rights in corporate stock. The question (to reiterate) is whether the voting of the children's shares in these

**25.** 139 Conn. 218, 92 A.2d 731 (1952).

**26.** Chancery Op., 2006 WL 3337163, at *6.

**27.** 2004 WL 726899, 2004 U.S. Dist. LEXIS 5522 (D.Conn. Mar. 31, 2004).

**28.** 99 Conn. 174, 121 A. 460 (1923) (holding that where a payment to a minor would have

satisfied a debt owed to the minor, a cash payment to the child's mother individually, rather than to a guardian for the child's estate, was insufficient protection to be considered a payment to the child).

**29.** Chancery Op., 2006 WL 3337163, at *6, *7.

circumstances was a "use" by the father of the minor children's property for purposes of Section 631(a).[30]

The Court of Chancery analogized Gray, Sr.'s voting the shares to his bringing a suit on behalf of his minor children as next friend. Reasoning from that analogical premise, the Vice Chancellor held that the same policy that justifies allowing a "next friend" suit to proceed without appointing a guardian for the minor's estate "warrants the conclusion that [Gray Sr.'s] ability to vote the stock in [Realty] of his minor children does not represent a 'use' of a valuable asset of theirs under [Section 631(a)]."[31] The Court of Chancery reasoned that:

> Unlike many of the Connecticut cases, [Gray, Sr.'s] situation does not contemplate the transfer of a liquid asset from an outside or third party to a minor, such as was involved in the *Ryle* case. . . . Here, the stocks and the economic interest in them have always been and remain in the children's names. . . . [Rich's] primary concern seems to be that [Gray, Sr.] will misuse the children's voting rights to benefit himself

and thereby undermine the rights of [Rich], as well as the children. Based on [Gray Sr.'s] troublesome history as a corporate fiduciary, these concerns are understandable. Adelia and Richard [Gray] and, for that matter, [Rich], have other means, however, to protect their respective interests against such wrongdoing. In the case of the children, their mother continues to have moral and fiduciary duties to them, and she, as well as others who might sue as next friend on behalf of the minors, could seek appropriate relief if [Gray, Sr.] breached any applicable duty.[32]

■ Having considered the record and the positions of the parties, we conclude that although the Court of Chancery correctly determined the applicable legal principle, it misapplied that principle to the facts at bar. The Court accurately distilled from the Connecticut cases the principle that a guardian for a minor child's estate must be appointed where a liquid asset belonging to the minor child, such as cash, is to be received. The Vice Chancellor held, however, that the concerns animating that principle are not im-

---

**30.** Although the Court of Chancery Opinion does not explicitly so state, it suggests that the voting of the Realty shares was not a "receipt" of the minor children's asset, because (analogizing the shares to a monetary recovery) Gray, Sr. never legally acquired ownership or power to dispose of the Realty shares. That is, the shares continued to be owned by the children and remained titled in their names. Accordingly, the Vice Chancellor proceeded to analyze the applicability of Section 631(a) in terms of whether the voting of the minor children's Realty shares constituted a "use" under that statute. Given our disposition of the case, we do not reach the issue of whether Gray, Sr.'s voting the shares constituted a "receipt" under Section 631(a).

**31.** Chancery Op., 2006 WL 3337163, at *10–*11.

**32.** *Id.* at *11. As an additional rationale for its holding, the Court observed that a "failure to vote the children's stock in these circumstances effectively would prevent the holders of a collective majority of shares from voting altogether, and preserve the status quo. As a result, the holders of 15% of the company's stock [Rich] would continue to control the board of [Realty]. By doing so, [Rich] would continue to control its landlord." *Id.* That observation has force only if it is assumed that no guardian of the children's estate is appointed, or that the appointment process would be unduly protracted. There is no evidence of record that a person other than Gray, Sr. would be precluded from being appointed, or that that the process of appointing that person would be protracted. Once duly appointed, the guardian would be empowered to vote the children's shares, thereby ending the minority control of Realty's board.

plicated where the parent merely exercises the voting rights associated with shares representing 49% of the corporation's voting power.

The difficulty with that analysis is that it ignores the reality of what the voting of those shares actually accomplished, and the resulting risk to the value of the minor children's Realty stock. The Court of Chancery analogized voting the children's shares to a scenario where a next friend brings a lawsuit on the children's behalf. The prosecution of such a lawsuit does not, by itself, pose any risk to the minor's assets. Only having access to the proceeds of a recovery would create that risk, against which Connecticut statutory law protects by requiring the prior appointment of a guardian of the minor's estate. Applying that analogy to these facts, the Court concluded that the mere casting of a vote representing 49% of Realty's shares did not place the minor children's stock in jeopardy, because the children continued to own the Realty shares and to control their underlying value.

The flaw in that reasoning is that in these specific circumstances the analogy breaks down. The Vice Chancellor accurately noted that if Realty were a publicly held corporation in which the minor children's shares did not enable the Gray family members to vote a controlling interest, then Gray, Sr. voting those shares would not create any risk that requires a court-appointed guardian. The reason is that in those circumstances, Gray, Sr. would have no access to the corporate assets that constitute the economic value underlying those shares.[33] That is not this case, however. Here, Gray, Sr.'s ability to vote his children's shares would result in giving him lawful access to the corporation's underlying economic value. Realty is a privately held company. The vote cast by Gray, Sr., combined with the vote cast by his daughter (Carson Gray) and his brother (B. David Gray), represented over 80% of the corporation's voting power. Casting that combined vote was intended to—and did—enable Gray, Sr. to replace the incumbent board. Importantly, the shares owned by Gray, Sr.'s minor children were indispensable to taking control of Realty, because without the votes those shares represented, Carson Gray and B. David Gray would have had only a minority voting interest.

By electing himself and his daughter as the new Realty board, which then elected Gray, Sr. as Realty's President and Treasurer, Gray, Sr. placed himself in operational control of a multi-million dollar asset—Realty.[34] Once installed in office, Gray, Sr. was positioned to have lawful access to Realty's cash stream and other economic values. That access would enable Gray, Sr. to divert Realty's cash for purposes that could reduce Realty's economic worth and the value of the minor children's stock interest. In the case of Gray, Sr., the gravity of that risk is well documented in this record. In that respect the position of Gray, Sr. in relation to Realty's cash stream was no different than that of a next friend or parent who successfully prosecutes a lawsuit on a minor child's behalf and then takes possession of the dollar recovery. For the same reasons a Connecticut court would require a guardian of the minor child's estate in that "next friend" scenario, a Connecticut court would require a guardian in this

---

**33.** *Id.* at *10 ("If the disputed shares were in a publicly traded company, like IBM, it is unlikely that anyone would claim that only a guardian could vote them.")

**34.** The lease payments are equal to $390,000 for the first five years (1998–2002) and $420,000 for the next five years (2003–2007). Appellees' Ans. Br. at 6.

case, which is functionally indistinguishable. In concluding otherwise, the Court of Chancery failed to apply Section 631(a) properly to the facts before it.[35]

 We hold that because the Realty shares owned by Gray, Sr.'s minor children could not be voted in the manner in which they were voted by anyone other than a court-appointed guardian, the vote cast by Gray, Sr. in the 2005 Shareholder Consent was invalid. As a consequence, the 2005 Shareholder Consent did not constitute lawful action by a majority of Realty's shareholders. It follows that the election of Gray, Sr. and Carson Gray as the *de jure* board of directors of Realty was also legally invalid, as was the election of the officers by Gray, Sr. and Carson Gray acting in their capacity as Realty's new board.

## *CONCLUSION*

For the reasons set forth, the judgment of the Court of Chancery is reversed, and the case is remanded to that Court for further proceedings consistent with this Opinion.

---

**35.** That "Adelia and Richard and, for that matter, [Rich] have other means ... to protect their respective interests against ... wrongdoing ..." (Chancery Op., 2006 WL 3337163, at *11), is not a sufficient basis for the result reached by the Court of Chancery. The policy underlying Section 631(a), as enunciated by the Connecticut cases, is to have in place a protection that would *prevent* harm to the minor children's property, as opposed to providing a remedy for the harm after it has already occurred. The available remedies identified by the Vice Chancellor in his Opinion are *ex post*, not *ex ante*.