**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| QC HOLDINGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0715-JTL |
| | ) | |
| ALLCONNECT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Date Submitted: June 11, 2018
Date Decided: August 28, 2018

S. Mark Hurd, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Danny David, Benjamin Sweet, Kelly Hanen, BAKER BOTTS L.L.P., Houston, Texas, *Counsel for Plaintiff*.

A. Thompson Bayliss, Cameron T. Kirby, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Matthew L. DiRisio, WINSTON & STRAWN LLP, New York, New York; Thomas G. Weber, WINSTON & STRAWN LLP, Chicago, Illinois, *Counsel for Defendant*.

**LASTER, V.C.**

Pursuant to a written put agreement,[1] defendant Allconnect, Inc. (the "Company") granted plaintiff QC Holdings, Inc. the right to cause the Company to repurchase 18,604,071 shares of its common stock (the "Put Shares") in return for a cash payment of $5 million (the "Put Price"). The Put Agreement recognized that the Company could not pay the Put Price unless it had sufficient funds legally available, including sufficient surplus under Section 160 of the Delaware General Corporation Law (the "DGCL").[2] The Put Agreement also subordinated the Company's obligation to pay the Put Price to any amounts due on its "Senior Indebtedness," which is a term defined in the Put Agreement.

On November 16, 2015, QC Holdings exercised the Put Right. QC Holdings delivered the original share certificate for the Put Shares to the Company, endorsed in favor of the Company. QC Holdings also provided an executed assignment in favor of the Company and represented in the exercise notice that it was transferring to the Company good title to the shares. All of these steps were required by the Put Agreement.

Under the Put Agreement, the Company's obligation to pay the Put Price did not mature until November 15, 2016. But when the time came to complete the purchase, the Company had Senior Indebtedness outstanding and lacked sufficient funds legally available to make payment. QC Holdings continued to wait for payment of the Put Price.

---

[1] Compl. Ex. A (the "Put Agreement"). The Put Agreement refers to the put as the "Put Right."

[2] 8 *Del. C.* § 160.

In September 2017, non-party New Imagitas Inc. ("Imagitas") acquired the Company via a reverse triangular merger, with the Company surviving as a wholly owned subsidiary of Imagitas (the "Merger"). Just before the effective time of the Merger, as part of the transaction, the Company paid off all of its Senior Indebtedness. In the Merger, the Company's various classes and series of shares were converted into the right to receive cash payments. Each share of common stock was converted into the right to receive approximately two cents per share. The Company did not use any of the merger proceeds to pay the Put Price, which equates to consideration for QC Holdings of approximately twenty-seven cents per share. Imagitas insisted, however, that the Company's preferred stockholders place $5.1 million in escrow (the "Escrow Fund") as a reserve against QC Holdings' claim to the Put Price.

QC Holdings filed this lawsuit to recover the Put Price and has moved for summary judgment. The Company opposes the motion and has cross moved for summary judgment. This decision directs the Company to use the Escrow Fund to satisfy QC Holdings' claims. If the Escrow Fund is insufficient to pay the Put Price in full, then further proceedings will be necessary to address the deficiency. Further proceedings also will be necessary to quantify the amount of expenses (including attorneys' fees) to which QC Holdings is entitled under the prevailing-party provision in the Put Agreement.

## I.     FACTUAL BACKGROUND

The facts for purposes of this decision are drawn from the affidavits and documents that the parties submitted in support of their cross motions for summary judgment. Neither side has asserted that there are any disputes of material fact. For purposes of the issues

2

presented on the cross motions, therefore, this matter is deemed to have been submitted for decision on a written record under Court of Chancery Rule 56(h).

## A. The Asset Sale

Pursuant to an asset purchase agreement dated October 28, 2013, the Company acquired substantially all of QC Holdings' assets (the "Asset Sale").[3] As consideration, the Company paid QC Holdings $7.5 million at closing, assumed certain liabilities, and agreed to pay QC Holdings an additional $2.5 million on the one-year anniversary of the closing. The Company also issued the Put Shares to QC Holdings, and the parties contemporaneously entered into the Put Agreement. The Asset Sale closed on November 15, 2013.

Section 1(a) of the Put Agreement gave QC Holdings the right to put the Put Shares to the Company in return for the Put Price.[4] QC Holdings could exercise the Put Right beginning on November 15, 2015, the second anniversary of the closing of the Asset Sale. Under Section 1(b) of the Put Agreement, starting on that date, QC Holdings would have

---

[3] At the time, QC Holdings had a different name. The old moniker is not relevant to the analysis, so for simplicity this decision refers only to QC Holdings.

[4] This is an oversimplification. The agreement that governed the Asset Sale contemplated that the Company might claw back some of the Put Shares to satisfy indemnification obligations, and Section 1(a) contained a formula to adjust the Put Price if the number of Put Shares was reduced. No reductions became necessary. The Put Agreement also authorized QC Holdings to transfer the Put Shares to "Permitted Transferees" who would have succeeded to QC Holdings' rights under the Put Agreement, and the formula in Section 1(a) also accounted for the number of Put Shares that each "Seller Party" exercising the Put Right might hold. QC Holdings never transferred any of the Put Shares, so that aspect of the Put Right never became relevant either.

3

sixty days in which to exercise the Put Right. If QC Holdings did not exercise the Put Right within the sixty-day period, then it would terminate.

Assuming that QC Holdings exercised the Put Right, the Company's obligation to pay the Put Price did not mature immediately upon exercise. Section 1(c) of the Put Agreement did not require that the Company pay the Put Price until November 15, 2016, the third anniversary of the Closing Date of the Asset Sale. The payment obligation thus did not mature until approximately one year after QC Holdings could exercise the Put Right.

Section 1(b) of the Put Agreement provided that QC Holdings' ability to exercise the Put Right would terminate early if one of several events occurred that would give QC Holdings an alternative path to liquidity. The Put Agreement referred to these events as "Deemed Liquidation Events," and they included: (i) an initial public offering, (ii) a third-party acquisition in which the Company's common stock was fully exchanged for cash or publicly traded securities, (iii) a sale of more than 50% of the Company's assets, or (iv) a transaction in which a third party acquired control of a majority of the Company's voting power. If any of the first three events occurred, and if the consideration that QC Holdings received was less than the Put Price, then the Company would owe QC Holdings a make-whole amount sufficient to enable QC Holdings to receive the Put Price. If the last of these events occurred—defined as a "Partial Liquidation Event," then the Company was obligated to require the acquirer to assume the Company's obligations under the Put Agreement or to allow the Put Right to become immediately exercisable.

4

**B.     Impediments To The Payment Of The Put Price**

Even after the Company's obligation to pay the Put Price matured on November 15, 2016, the ensuing payment was not automatic. The Put Agreement recognized that the Company could comply only if it had sufficient funds legally available to make a redemption. Section 1(d) of the Put Agreement stated:

> Notwithstanding anything to the contrary contained in this Section 1, the Company's obligation to repurchase any Put Shares under this Section 1 is subject to the General Corporation Law of Delaware and any other applicable local, state or federal law, statute or rule and, without limiting the effect of any other provision of this Agreement, including Section 3, the Company shall have no obligation to repurchase the Put Shares to the extent that doing so would conflict with the General Corporation Law of Delaware or other applicable law.

By early 2015, it had become highly unlikely that the Company would have sufficient funds legally available to pay the Put Price.

QC Holdings was not the only stockholder that held a redemption right. The holders of the Company's Series F and F-1 preferred stock ("Series F Preferred") also had the right to have their shares redeemed. In their case, it was for total redemption consideration of $64.8 million, and the Company was obligated to redeem one third of the shares on each of three dates: April 5, 2015, April 5, 2016, and October 5, 2016. Any redemption amounts that were not paid on the specified date would bear interest at a rate of 15% per annum.

The Company finished 2014 with cash flow of negative $10 million and adjusted EBITDA of negative $1 million. At the beginning of 2015, the Company's board of directors formed a special committee to evaluate whether the Company had sufficient funds

legally available to make the Series F Preferred redemption payment. In March 2015, the special committee concluded that the Company lacked sufficient funds. On April 1, the special committee informed the holders of the Series F Preferred that the Company would be unable to redeem the Series F shares until it possessed sufficient funds. The holders of the Series F Preferred exercised their redemption right anyway.

Nor was a lack of legally available funds the only potential impediment to QC Holdings' receipt of the Put Price. Section 3(c) of the Put Agreement subordinated all of the Company's "Obligations" to QC Holdings under the Put Agreement, including its obligation to pay the Put Price, to any outstanding Senior Indebtedness.[5] The provision further stated that QC Holdings "will not demand or receive from the Company (and the Company will not pay to [QC Holdings]) all or any part of the Obligations, by way of payment, prepayment, setoff, lawsuit, or otherwise . . . for so long as any Senior Indebtedness remains outstanding."[6] The Put Agreement defined "Senior Indebtedness" as

> the principal of (and premium, if any), unpaid interest on and amounts reimbursable, fees, expenses, costs of enforcement and other amounts due in connection with, (i) indebtedness for borrowed money of the Company, to banks, commercial finance lenders or other lending institutions regularly engaged in the business of lending money, and (ii) any extension, refinance, renewal, replacement, defeasance or refunding of any indebtedness described in clause (i).[7]

---

[5] *See* Put Agreement § 3(c).

[6] *Id.*

[7] *Id.* § 3(a).

6

These amounts would constitute Senior Indebtedness unless "expressly subordinated to, or made on a parity with, the amounts due by the Company under this Agreement."[8]

In March 2015, Covestco-Seteura, LLC loaned the Company $3 million in exchange for a promissory note collateralized by certain accounts receivable (the "Covestco Loan"). The Company used the proceeds for working capital. The Covestco Loan originally had a maturity date of April 2015, but the parties extended it until January 2018.

In December 2015, the Company obtained a revolving credit facility from Heritage Bank that authorized borrowings of up to $7 million (the "Heritage Loan"). The Heritage Loan required interest-only payments through its original maturity date in November 2017, which the parties subsequently extended. In December 2015, the Company drew approximately $3 million for working capital.

## C.     QC Holdings Exercises The Put Right.

On November 16, 2015, QC Holdings exercised the Put Right. Section 1(c) of the Put Agreement specified the procedure that QC Holdings needed to follow:

> To exercise the Put Right, after the Exercise Date but no later than the Exercise Period End Date, [QC Holdings] shall deliver
>
> [1] a written notice to the Company in the form attached hereto as **Exhibit A** and in accordance with Section 4(g) hereof indicating its election to exercise this Put Right with respect to all of the Put Shares along with
>
> [2] an executed Assignment Separate from Certificate in the form attached as an exhibit to the Asset Purchase Agreement and

---

[8] *Id.*

[3] the original stock certificate representing the Put Shares.[9]

As required by the Put Agreement, QC Holdings sent the exercise notice, the original share certificate for the Put Shares, and an assignment of shares. The Company confirmed receipt and acknowledged that it would "conduct a payout according to the Terms of the Put Agreement."[10]

Although it did not matter at the time because the obligation to pay had not yet matured, the Company lacked sufficient funds legally available to satisfy the Put Right in November 2015. The Company also could not have paid the Put Price because that obligation was subordinated to the Heritage Loan and the Covestco Loan.

By letter dated November 2, 2016, the Company informed QC Holdings that it would not be paying the Put Price on November 15, 2016, because it had taken on Senior Indebtedness and the obligation to pay the Put Price was subordinated to that debt. The November 2, 2016 letter informed QC Holdings that the Senior Indebtedness was likely to continue past its stated maturity date on December 4, 2017.

## D. The Merger

In mid-2017, the Company told QC Holdings that it was exploring strategic alternatives. The Company proposed that in lieu of the Put Price, QC Holdings should accept the per-share consideration that any sale generated for the common stockholders. QC Holdings declined.

---

[9] Formatting added.

[10] Compl. Ex. D, at 2.

8

The Company subsequently entered into a merger agreement with Imagitas dated September 7, 2017 (the "Merger Agreement"). The Merger closed that same day. Under the Merger Agreement, a wholly owned acquisition subsidiary of Imagitas merged with and into the Company, with the Company surviving the Merger as a wholly-owned subsidiary of Imagitas.

The Merger ascribed an enterprise value to the Company of approximately $83 million. Of this amount, $10.8 million was used at closing to pay off all of the Company's outstanding debt, including its Senior Indebtedness. Imagitas required that another $5.1 million be used to establish the Escrow Fund as a reserve to address QC Holdings' claim under the Put Agreement. Any amounts not used to satisfy QC Holdings' claim would be distributed to certain former preferred stockholders. The remaining $67 million was allocated to the Company's stockholders, with the bulk going to preferred stockholders. The holders of the Series F Preferred withdrew their claim for redemption and received their liquidation preference of approximately seventeen cents per share.

Given the liquidation preferences and other rights of the preferred stock, the common stockholders would not have received any consideration in the Merger. With the consent of the preferred stockholders, the parties reallocated some consideration to the common stockholders. As a result, the common stock was converted into the right to receive approximately two cents per share.

After paying off the Senior Indebtedness, during the moment before the stockholders' shares were converted into the right to receive the merger consideration, the Company did not pay the Put Price to QC Holdings. The Company contends that it still

lacked legally available funds to do so. The Company maintains that the merger consideration itself cannot be regarded as legally available funds.

## E.     This Litigation

On October 9, 2017, QC Holdings filed this action to recover the Put Price and its reasonable attorneys' fees. The Company filed an answer in which it raised defenses under the Put Agreement and Section 160 of the DGCL. The parties subsequently filed cross motions for summary judgment.

## II.     ANALYSIS

Under Court of Chancery Rule 56(c), summary judgment may be granted when "there is no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law."[11] "The role of a trial court . . . is to identify disputed factual issues whose resolution is necessary to decide the case, but not to decide such issues. In discharging this function, the court must view the evidence in the light most favorable to the non-moving party."[12] "Summary judgment is particularly appropriate in a dispute over an unambiguous contract because there is no need to resolve material disputes of fact."[13]

---

[11] Del. Ct. Ch. R. 56(c).

[12] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992) (citation omitted).

[13] *XO Commc'ns, LLC v. Level 3 Commc'ns, Inc.*, 948 A.2d 1111, 1124 (Del. Ch. 2007) (internal quotation marks omitted) (quoting *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)); *see also The HC Cos., Inc. v. Myers Indus., Inc.*, 2017 WL 6016573, at *2, 9 (Del. Ch. Dec. 5, 2017) (granting motion for summary judgment on plaintiff's breach of contract claim); *West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, *9, *13 (Del. Ch. Nov. 2, 2007) (same).

10

The parties agree that when the Company's obligation to pay the Put Price matured on November 15, 2016, the Company (i) lacked sufficient funds legally available to pay the Put Price and (ii) could not have used any funds to make the payment because the Heritage Loan and the Covestco Loan constituted outstanding Senior Indebtedness. After that, the parties' positions diverge.

The Company contends that its obligation to pay the Put Price was extinguished when it could not make the redemption payment on November 15, 2016. QC Holdings disagrees and says that the obligation to pay the Put Price continued to exist, although it was suspended until just before the effective time of the Merger, when the Company paid off the Senior Indebtedness. Once that happened, QC Holdings says that the Company was required to pay the Put Price before the Merger closed.

In my view, neither theory is correct. Rather, in my judgment, the outcome turns on the status of the Put Shares at the effective time. If they remained outstanding, then they were converted into the right to receive the merger consideration. In this case, however, the Put Shares had been transferred to the Company, and the resulting contractual commitment to pay the Put Price survived the Merger as an obligation of the surviving corporation under Section 259 of the DGCL.[14]

## A.      The Company's One-Day-Only Argument

The Company contends that the obligation to pay the Put Price existed only on November 15, 2016, after which it terminated. From the Company's standpoint, if it could

---

[14] 8 *Del. C.* § 259.

not pay the Put Price on that date, then QC Holdings was left with nothing. Under this view, the Put Agreement was the equivalent of a baseball ticket without any protection for cancellations or postponements. If the game could not go forward on the date scheduled, the ticket holder would be out of luck: no rainchecks, refunds, or exchanges. In my view, that interpretation would result in a forfeiture, rendering it suspect and disfavored. Under the only reasonable reading of the agreement, the obligation to pay the Put Price continued, subject to the Company's ability to pay.

Although the Company's argument is extreme, it has some textual support. Section 1(c) of the Put Agreement specifies that "the Company shall pay to [QC Holdings] on the third anniversary of the Closing Date the Put Price in cash (by cashier's check or wire transfer) . . . ." It does not speak in terms of an ongoing obligation to pay if the Company could not make the payment on November 15, 2016.

There are also provisions in the Put Agreement which recognize that the Company might not be able to pay the Put Price on November 15, 2016. Section 1(d) states that "the Company shall have no obligation to repurchase the Put Shares to the extent that doing so would conflict with the General Corporation Law of Delaware or other applicable law." It goes on to provide that if the Company lacks sufficient funds legally available to pay the Put Price in full, then the Company will redeem as many shares as it can and, if multiple stockholders had exercised the Put Right, allocate the repurchases *pro rata* among those stockholders. In the language of the Put Agreement,

> [i]f the funds legally available for repurchase of the Put Shares shall be insufficient to permit the payment of the full Put Price, the Company shall effect any repurchase pro rata among each

12

Seller Party exercising their respective put rights pursuant to this Agreement such that each Seller Party shall receive a payment equal to a fraction of the aggregate amount available for repurchase the numerator of which shall be based on such Seller Party's Put Shares, and the denominator of which shall be the aggregate number of Put Shares exercised pursuant to this Agreement.[15]

This section of the Put Agreement does not contain any language that expressly contemplates an ongoing payment obligation or the treatment of any deficiency.

The Company points out that when sophisticated parties negotiate redemption rights, they frequently include language specifying that the obligation to redeem the shares will be ongoing. The redemption rights addressed in other cases illustrate this point.[16] Closer to home, the redemption right enjoyed by the holders of the Series F Preferred established an ongoing redemption obligation, stating:

At any time and from time to time thereafter when additional funds of the Corporation are legally available for redemption of shares of Preferred Stock, such funds immediately will be used to redeem the balance of the shares of Preferred Stock which the Corporation has become obligated to redeem on any Redemption Date but which it has not redeemed . . . .[17]

No analogous provision appears in the Put Agreement.

Although the Company has a linguistically plausible position, the text of Section 1(d) does not state explicitly that the obligation to pay the Put Price terminates. Nor does

---

[15] Put Agreement § 1(d).

[16] *See, e.g.*, *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *4 (Del. Ch. Apr. 14, 2017) (describing preferred stock redemption right which specified that redemption obligation was ongoing); *SV Inv. P'rs, LLC v. Thoughtworks, Inc.*, 7 A.3d 973, 978-79 (Del. Ch. 2010), *aff'd*, 37 A.3d 205 (Del. 2011) (same).

[17] Picchi Aff. Ex. B, § 8(e).

13

it say that the Company shall have no further obligation to make any payment if it cannot redeem all of the Put Shares on November 15, 2016. Instead, the language states that the Company has no obligation to repurchase the Put Shares "*to the extent that* doing so would conflict with the General Corporation Law of Delaware or other applicable law."[18] The use of "to the extent" implies a partial carving back of the obligation, consistent with a suspension rather than termination. The Put Agreement uses similar language when addressing the subordination of the redemption obligation to any Senior Indebtedness. Section 3(f) of the Put Agreement provides that all "Obligations" established by the Put Agreement are subordinated to any Senior Indebtedness "for so long as the Company owes any amounts under the Senior Indebtedness." The use of "for so long as" implies that the obligation to pay the Put Price continued and did not terminate if it could not be fulfilled on November 15, 2016.

When the Put Agreement is read as a whole and in context, the Company's interpretation is unreasonable. If adopted, it would result in a commercially irrational forfeiture. "Generally, the law does not favor a forfeiture. For a condition to effect a forfeiture, it must be unambiguous."[19] If the language does not clearly provide for a forfeiture, then a court will construe the agreement to avoid causing one.[20]

---

[18] Put Agreement § 1(d) (emphasis added).

[19] *Martin v. Hopkins*, 2006 WL 1915555, at *6 (Del. Super. June 27, 2006) (citations omitted).

[20] *McDowell v. Greenfield*, 2008 WL 1952169, at *8 (Del. Ch.) (master's report), *aff'd*, 2008 WL 3021032 (Del. Ch. Aug. 1, 2008).

The language of the Put Agreement does not clearly provide for a forfeiture. As discussed, it is silent as to either an abrupt termination or a continuing obligation. The phrases "to the extent that" and "for so long as" both imply a continuing obligation.

In my view, it would have been commercially irrational for QC Holdings to accept the type of one-day-only payment obligation that the Company now suggests. The limitations on a Delaware corporation's ability to redeem its shares are widely known and well understood.[21] The Put Agreement itself mentioned these limitations and added a contingency based on the existence of Senior Indebtedness. The likelihood that QC Holdings would receive the Put Price on November 15, 2016, was therefore highly contingent. Moreover, the Senior Indebtedness contingency was something that the Company could largely control. If the obligation to pay the Put Price lasted only one day, the Company could defeat it by taking on some amount of debt for a legitimate business purpose. Although an egregious manipulation might violate the implied covenant of good faith and fair dealing, the Company would not have to go very far to extinguish the payment obligation.

The Put Shares represented one-third of the total consideration that QC Holdings received in the Asset Sale. As a holder of common stock, QC Holdings faced the risk of a downside loss but also enjoyed the prospect of upside gain. It seems rational for QC

---

[21] *See Thoughtworks*, 7 A.3d at 991 (noting the "venerable and widely recognized impediments to mandatory redemptions," surveying other methods that investors have developed "to protect themselves and secure exit opportunities," and citing National Venture Capital Association's recognition of limitations on mandatory redemptions).

Holdings to swap an illiquid equity security without a readily ascertainable market value for a contractual entitlement to $5 million, even if the timing of the payout depended on the Company's access to sufficient funds legally available and the absence of Senior Indebtedness. To my mind, it would have been irrational for QC Holdings to wager everything on the Company's ability to pay $5 million on a particular date one year in the future, particularly given the legal strictures on satisfying a redemption obligation and the ability of the Company to manipulate the pertinent metrics. Interpreting the Put Agreement to impose that bargain on QC Holdings would constitute an absurd reading of the contract.

The Company's conduct supports this interpretation. Until this litigation, the Company acted as if the obligation continued. In its November 2, 2016, letter regarding the Put Right, the Company informed QC Holdings about the Senior Indebtedness and stated that its "obligation to otherwise pay the Put Right is subordinate to the Company's obligations to holders of Senior Indebtedness for so long as any Senior Indebtedness remains outstanding."[22] The Company noted that its Senior Indebtedness had a maturity date of December 4, 2017, but would likely be extended or replaced with a substitute credit facility that would "qualify as Senior Indebtedness pursuant to the terms and conditions of the Put Right Agreement and would continue to result in the deferral of any Company obligation to pay the Put Right."[23] These statements are inconsistent with a one-day-only payment obligation that terminated on November 15, 2016. The Company also carried the

---

[22] Cumings' Aff. Ex. F.

[23] *Id.*

16

$5 million redemption obligation on its books in 2016 and 2017, after the one-day-only obligation ostensibly terminated.

Under the plain language of the Put Agreement, the Company had an ongoing obligation to pay the Put Price. Although the obligation matured on November 15, 2016, the Put Agreement contemplated that the Company might not be able to make the payment on that date. The obligation remained outstanding, subject to the Company's ability to pay under the terms of the Put Agreement and the strictures of Delaware law.

## B.    QC Holdings' Pay-Before-The-Merger Claim

QC Holdings argues that because the Put Right was merely suspended, the Company had to pay the Put Price as soon as its Senior Indebtedness was paid off, which happened just before the effective time of the Merger. This argument fails because QC Holdings has not pointed to any evidence that the Company had sufficient funds legally available to satisfy its redemption obligation, and the merger consideration cannot be treated as "funds legally available."

Before it could pay the Put Price, the Company had to have sufficient funds legally available to make the payment. The Company has explained persuasively that as a standalone entity, it did not have any legally available funds. Among other things, at the time of the Merger, the Company had still not made any redemption payments to the Series F Preferred, and their redemption claim had priority over QC Holdings' Put Right. It is true that in connection the Merger, the holders of the Series F Preferred gave up their redemption claim and accepted the merger consideration, but that only happened as a result of the Merger. There was no moment in time, independent of the Merger, when the

17

Company had the ability to pay the Put Price. QC Holdings has not offered any evidence that might create a dispute of fact to the contrary.

Implicitly recognizing that the Company did not have sufficient funds reasonably available, QC Holdings argues that the merger consideration that went to the Company's equity holders constituted a pool of legally available funds that should have been used to pay the Put Price before any amounts went to the various equity holders. At oral argument, QC Holdings' counsel explained his view of a merger as creating a pool of capital that becomes available to the acquired company, which is then allocated according to the priority of the investors' claims. Although intuitively attractive and historically grounded in the principal predecessor to the merger (a sale of assets followed by a liquidation), the Delaware Supreme Court rejected the use of functional analogies in the *Havender* case,[24] laying the groundwork for the doctrine of independent legal significance.[25] Instead, the *Havender* court discussed and gave effect to the concept of a conversion of shares under the merger statute as a transmutation that operates at the stockholder level without any attendant entity-level effect.[26] Subsequent Delaware decisions have adhered to the distinct

---

[24] *Fed. United Corp. v. Havender*, 11 A.2d 331, 337-43 (Del. 1940).

[25] *See id.* at 338; *see also Orzeck v. Englehart*, 195 A.2d 375, 378 (Del. 1963) (explaining that "action taken under one section of [the DGCL] is legally independent, and its validity is not dependent upon, nor to be tested by the requirements of other unrelated sections under which the same final result might be attained by different means"). *See generally* C. Stephen Bigler & Blake Rohrbacher, *Form or Substance? Past, Present, and Future of the Doctrine of Independent Legal Significance*, 63 Bus. Law 1, 4-5 (2007) (tracing the history of the doctrine to the reasoning in *Havender*).

[26] *See Havender*, 11 A.2d at 338-39 (explaining that under the merger statute, shares can be "converted" in a merger: "A well understood meaning of the word 'convert', is to

concept of stockholder-level conversion by merger and refused to equate it with other corporate events.[27] Section 251(b)(5) of the DGCL recognizes that shares need not be converted into consideration from one of the constituent corporations; the merger

---

alter in form, substance or quality. Substantial rights of shareholders, as is well known, may include rights in respect of voting, options, preferences and dividends. The average intelligent mind must be held to know that dividends may accumulate on preferred stock, and that in the event of a merger of the corporation issuing the stock with another corporation, the various rights of shareholders, including the right to dividends on preference stock accrued but unpaid, may, and perhaps must, be the subject of reconcilement and adjustment."); *Warner Commc'ns, Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 967-68 (Del. Ch. 1989) (Allen, C.) (holding that adverse effect on preferred stock in merger was caused by conversion into different security and not by any amendment, alteration, or repeal of a provision in the certificate of incorporation); *Shields v. Shields*, 498 A.2d 161, 167 (Del. Ch. 1985) (Allen, C.) ("When duly effectuated, [a merger] effects by operation of law a transmutation of the stock interest in a constituent corporation."); *id.* at 168 (explaining that at the effective time, "the stock in a constituent corporation (other than the surviving corporation) ceases to exist legally . . . and its place is taken by a stock interest in another, distinct corporation").

[27] *See, e.g., Rothschild Int'l Corp. v. Liggett Gp.*, 474 A.2d 133, 136 (Del. 1984) (holding that conversion of shares by merger was not a liquidation that triggered a liquidation preference); *Union Chem. & Mat'ls Corp. v. Cannon*, 148 A.2d 348, 352 (Del. 1959) (holding that "conversion of shares by merger is not a transfer or assignment"); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 112 (Del. 1952) (rejecting argument that merger was a sale of assets; holding that a merger is "something quite distinct" and that the merger "is not merely one of form"); *Dart v. Kohlberg, Kravis, Roberts & Co.*, 1985 WL 21145, at *6 (Del. Ch. May 9, 1985) (holding that conversion of shares by merger was not an involuntary dissolution, liquidation, or winding up); *see also, e.g.*, *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 849 (Del. 2002) (requiring an explicit reference to "merger" in a protective provision before it would apply to changes to the corporate structure effected by a merger accompanied by the conversion of shares); *Benchmark Capital P'rs IV, L.P. v. Vague*, 2002 WL 1732423, at *7 (Del. Ch. July 15, 2002) (interpreting Delaware precedents to hold, "in general terms . . . that protective provisions drafted to provide a class of preferred stock with a class vote before those shares' rights, preferences and privileges may be altered or modified do not fulfill their apparent purpose of assuring a class vote if adverse consequences flow from a merger and the protective provisions do not expressly afford protection against a merger").

19

agreement can specify that shares will be converted into the right to receive "cash, property, rights or securities of any other corporation or entity . . . , which cash, property, rights or securities of any other corporation or entity may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation."[28] There is no necessary connection between the consideration provided for shares in a merger agreement and the existence of funds legally available for a redemption.

In this case, Imagitas was the source of the consideration. The Company never had the consideration, so the consideration could not have constituted legally available funds. The Company therefore did not have any obligation to pay the Put Price before the Merger closed.

## C.    The Status Of QC Holdings' Shares

In my view, the central issue in this case is the status of the Put Shares at the time of the Merger. If QC Holdings still held the Put Shares, then they were converted into the right to receive the merger consideration. Delaware cases indicate that under those circumstances, the existence of the Put Right would not give QC Holdings the right to receive the Put Price; instead, the Merger would render the right to receive the Put Price moot, because the Merger would have caused the Put Shares to vanish and be replaced with something else (the right to receive the merger consideration).[29] If, however, QC Holdings

---

[28] 8 *Del. C.* § 251(b)(5).

[29] *See Shields*, 498 A.2d at 168 (explaining that at the effective time, the stock of the merged corporation "ceases to exist legally" and "[t]he subject matter of the stockholders' agreement thus vanishes, so to speak"); *id.* at 168 ("[T]he effect of the merger was not so much the abolishment of a contract right but the mooting of it, since as a result

had transferred the Put Shares to the Company when it exercised the Put Right, then that analysis no longer applies. Instead, from that point on, QC Holdings held a contractual redemption right that continued under Section 259 of the DGCL as an obligation of the surviving corporation.

Section 201 of the DGCL states that "[e]xcept as otherwise provided in this chapter, the transfer of stock and the certificates of stock which represent the stock . . . shall be governed by Article 8 of [the Delaware Uniform Commercial Code (the 'UCC')]."[30] Under Section 8-103(a) of the UCC, "[a] share or similar equity interest issued by a corporation . . . is a security."[31] Under Section 8-104(a)(1), a person "acquires a security" if "the person is a purchaser to whom a security is delivered pursuant to Section 8-301."[32] Under Section 8-301(a)(1), delivery of a certificated security occurs when "the purchaser acquires possession of the security certificate."[33] Under Article 8, "[t]he concept of delivery refers to the implementation of a transaction."[34]

---

of the merger the stock to which the right related disappeared by operation of law."); *see also Union Chem.*, 148 A.2d at 352 (holding that by virtue of conversion of shares by merger, the shares that supported jurisdiction under the sequestration statute ceased to exist and the Court of Chancery lost jurisdiction to proceed, notwithstanding the existence of a valid attachment lien against the shares).

[30] 8 *Del. C.* § 201.

[31] 6 *Del. C.* § 8-103(a).

[32] 6 *Del. C.* § 8-104(a)(1).

[33] 6 *Del. C.* § 8-301(a)(1).

[34] *Id.* cmt. 1.

21

In this case, QC Holdings' shares were represented by a stock certificate, making them a certificated security for purposes of Article 8.[35] When QC Holdings properly exercised the Put Right in November 2015, it tendered the original stock certificate (duly endorsed for transfer), provided the required assignment, and represented in the exercise notice that it was transferring to the Company good title to all economic and voting interests in the stock.[36] The Company took possession of the certificate, the notice of exercise, and the assignment. As a result, the Company acquired the securities for purposes of title under Article 8, subject to an obligation to pay the Put Price. Because the Company never paid the Put Price, QC Holdings can now sue to enforce that contractual obligation. Presumably QC Holdings could have cancelled the transfer if it wished, but this decision need not grapple with that issue.

In light of these steps, QC Holdings was no longer a stockholder after November 2015. Instead, it held a contractual claim against the Company for a redemption payment in the amount of the Put Price, subject to the terms of the Put Agreement and Section 160 of the DGCL.

Under Section 259 of the DGCL, a contractual claim against a constituent corporation survives a merger as a claim against the surviving entity. Section 259(a) states:

---

[35] *See* 6 *Del. C.* § 8-102(a)(4) ("'Certificated security' means a security that is represented by a certificate.").

[36] *See* Cumings' Aff. Ex. C ("The performance by Holder of his or her obligations hereunder will be effective to transfer good title to the Company of all economic and voting interests in the Holder Shares . . . .").

22

When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations, as the case may be, possessing all the rights, privileges, powers and franchises as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated; and all and singular, the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to any of said constituent corporations on whatever account, as well for stock subscriptions as all other things in action or belonging to each of such corporations shall be vested in the corporation surviving or resulting from such merger or consolidation; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations, and the title to any real estate vested by deed or otherwise, under the laws of this State, in any of such constituent corporations, shall not revert or be in any way impaired by reason of this chapter; but all rights of creditors and all liens upon any property of any of said constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.[37]

This section makes clear that the Company's contractual obligations under the Put Agreement survived the Merger and remained obligations of the Company in its capacity as the surviving corporation.[38]

---

[37] 8 *Del. C.* § 259(a).

[38] *See, e.g.*, *Del. Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1078 (Del. 2006) ("[A] merger does not allow a predecessor corporation to avoid its pre-merger obligations. Rather, the 'liabilities and duties of the respective constituent corporations shall thenceforth attach to . . . [the] surviving . . . corporation, and may be

This decision does not hold that whenever a party exercises a redemption right, the party loses its status as a stockholder and becomes a contractual claimant. Redemption rights can be drafted in any number of ways. It would be possible for the stockholder to continue to hold its shares and exercise the right to vote and other rights associated with stock ownership until the redemption was complete. It also would be possible for a contract to address explicitly whether the party that exercised the redemption right continued as a stockholder or became a contractual claimant. In this case, the parties did not address the issue explicitly, but the terms of the Put Agreement called for delivery of an endorsed stock certificate, plus an assignment, plus representations regarding the transfer of title. Having complied with those terms, QC Holdings became a contractual claimant, albeit one that could not enforce the traditional rights of a creditor because of the statutory and common law limitations on redemption.[39] QC Holdings' contractual rights survived the Merger and continued as an obligation of the Company in its capacity as the surviving corporation.

---

enforced against it . . . as if . . . [the] debts, liabilities and duties had been incurred or contracted by it.'" (footnote omitted) (quoting 8 *Del. C.* § 259(a))).

[39] A party holding an unsatisfied right to have its shares redeemed is not a creditor of the corporation that bears the redemption obligation. *See, e.g.*, *ODN*, 2017 WL 1437308, at *13; *Harbinger Capital P'rs Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 225 (Del. Ch. 2006); *HB Korenvaes Invs., L.P. v. Marriot Corp.*, 1993 WL 205040, at *5 (Del. Ch. June 9, 1993) (Allen, C.). Both Section 160 of the DGCL and longstanding common law doctrine constrain a corporation's ability to purchase its own shares. *See Thoughtworks*, 7 A.3d at 985. Parties seeking to enforce redemption rights regularly chafe against these limitations, but they confer substantial benefits on both issuers and capital providers during other phases of the corporate life cycle. For example, the limitations on redemption enable preferred stock with debt-like features to be classified as equity for tax purposes, thereby avoiding the problem of imputed interest and lowering the cost of capital for VC-backed startups. *See* Ronald J. Gilson & David M. Schizer, *Understanding Venture Capital Structure: A Tax Explanation for Convertible Preferred Stock*, 116 Harv. L. Rev.

**D.    An Order Of Specific Performance Regarding The Escrow Fund**

Having determined that the Company remains bound by the Put Agreement post-Merger, the question becomes whether there are any disputes of material fact that would prevent a grant of summary judgment requiring the Company to perform its obligation under the Put Agreement. Without the Escrow Fund, the motion for summary judgment would have to be denied so that the parties could develop a record regarding whether the Company currently has sufficient funds legally available to pay the Put Price. With the Escrow Fund, the analysis is straightforward. Under the Merger Agreement, the Company designated the Escrow Fund as funds legally available to satisfy QC Holdings' claims. Although QC Holdings cannot obtain a money judgment that would give it creditor status, QC Holdings is entitled to a decree of specific performance compelling the Company to use the Escrow Fund to fulfill its obligations under the Put Agreement.

"A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties."[40] Its purpose "is to place the

---

874, 902-04 (2003) (explaining the tax benefits of preferred stock relative to debt); *see also* George W. Dent, Jr., *The Role of Convertible Securities in Corporate Finance*, 21 J. Corp. L. 241, 261-62 (1996) (citing advantages of convertible preferred for unseasoned companies). The same ability to treat preferred stock with debt-like features as equity also carries benefits for companies operating in regulated industries, such as financial institution that have to meet capital requirements. *See* Mark P. Gergen & Paula Schmitz, *The Influence of Tax Law on Securities Innovation in the United States: 1981-1997*, 52 Tax L. Rev. 119, 132-33, 155-56 (1998) (discussing tax implications of various securities).

[40] *CertainTeed Corp. v. Celotex Corp.*, 2005 WL 217032, at *6 (Del. Ch. Jan. 24, 2005) (Strine, V.C.).

aggrieved party in the position that it would have been in but for the breach."[41] "[S]pecific performance is a matter of grace that rests in the sound discretion of the court."[42] Its proponent

> must prove by clear and convincing evidence that he or she is entitled to specific performance and that he or she has no adequate legal remedy. A party seeking specific performance must establish that (1) a valid contact exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance.[43]

A decree of specific performance is the appropriate form of relief to compel the release of funds from an escrow account.[44]

In this case, all of the requirements for a decree of specific performance are met. The Put Agreement is a valid and binding contract, QC Holdings has performed fully under its terms, and the balance of the equities favors an order of specific performance. The decree will enable QC Holdings to receive payment for its shares, nearly three years after

---

[41] *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1998 WL 71836, at *9 (Del. Ch. Feb. 4, 1998).

[42] *Peden v. Gray*, 886 A.2d 1278 (Del. 2005) (TABLE).

[43] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (footnotes omitted).

[44] *See Sparton Corp. v. O'Neil*, 2018 WL 3025470, at *4 (Del. Ch. June 18, 2018); *Haney v. Blackhawk Network Hldgs., Inc.*, 2017 WL 543347, at *4 (Del. Super. Feb. 8, 2017) (holding that a claim for the release of escrow funds was equitable in nature because any damage award would require plaintiff to seek specific performance or an affirmative injunction); *see also East Balt LLC v. East Balt US, LLC*, 2015 WL 3473384, at *2-4 (Del. Ch. May 28, 2015) (holding that this court had jurisdiction over an action for "an order requiring Defendants to provide joint written instructions directing the Escrow Agent to release the remaining Escrow Amount" because money judgment alone would not be an adequate remedy).

26

exercising the Put Right. Using the Escrow Fund for this purpose will not harm the Company, because the amounts in the Escrow Fund have been set aside to satisfy QC Holdings' claims under the Put Agreement.

If the Escrow Fund is not sufficient to satisfy QC Holdings' claims, then further proceedings may be necessary. If the deficiency involves an amount due for redemption, then the parties will need to develop a record regarding the extent to which the Company has sufficient funds legally available. If the deficiency only involves amounts due under the prevailing-party provision for attorneys' fees found in Section 4(i) of the Put Agreement, then discovery into funds legally available should not be necessary, because the statutory and common law limitations on redemption would not apply to the contractual fee-shifting obligation. Further proceedings would remain necessary to quantify the amount of the fee award.

## III.    CONCLUSION

Summary judgment is granted in favor of QC Holdings. A decree of specific performance will issue that orders the Company to use the Escrow Fund to satisfy QC Holdings' claims under the Put Agreement. If the parties cannot agree on the form of the decree, then they shall submit competing orders within ten days. Within thirty days, the parties shall submit a joint letter identifying any remaining issues that must be addressed to bring this matter to a conclusion at the trial level. If further proceedings are necessary, then the parties shall propose a schedule.